# CHARLESTON.

## PEARSON *v.* WEST VIRGINIA LIME AND CEMENT CO.

Submitted September 15, 1904. Decided December 20, 1904.

1. EVIDENCE—*Question of Fact—Appeal and Error—When Lower·
   Court Reversed on Facts.*
   Though upon a question of fact, as to which there is conflicting evidence, the finding of the trial court is entitled to·
   peculiar weight and will not ordinarily be disturbed, the appellate court will reverse such finding, when there is a decided
   preponderance of the evidence against it and the finding itself
   is inconsistent with what the evidence, on the whole, clearly
   shows was intended to be the relation of the parties toward one ·
   another. (p. 660).

Appeal from Circuit Court, Tucker county.

Action by Richard P. Pearson against the West Virginia

Lime and Cement Company. Decree for plaintiff, and defendant appeals.

*Reversed.*

W. B. MAXWELL and A. JAY VALENTINE, for appellant.

TALBOTT & HOOVER and FRED O. BLUE, for appellee.

POFFENBARGER, PRESIDENT :.

The main question in this case, necessary to be considered in order to determine the propriety of the decree appealed from, is the nature of the respective interests of the plaintiff on one side and the defendants on the other, in a certain mining property in Tucker county, known as the West Virginia Lime and Cement Company property. There is a corporation bearing the name of the properties, and, as belonging to which, it is treated in the decree complained of, and, in a certain sense, by the parties; but it seems that no formal conveyances of the property have ever been made to it, and that the parties in whose names the legal titles of the property stand have executed no formal contract with the corporation, binding them to convey. Their rights and interests are dependent upon parol evidence, and to effectuate the object of the bill on the one hand, and to maintain the defense on the other, by upholding the alleged rights of the defendants, specific performance of certain parol contracts, in respect to which, however, there is some correspondence, must be either enforced, or the parties left free to vindicate their rights in some other suit. On the basis of the understanding between the parties, concerning this property and its development, the defendants have expended about thirty thousand dollars. They furnished the money and entrusted its expenditure to the plaintiff. After the property had been purchased and the plant erected, the defendants became dissatisfied with the management of the plaintiff and ousted him from the control of the business. Up to the date of this occurrence, about December 1, 1902, there seems to have been no misunderstanding or differences as to the respective interests of the parties, except that when the agreement to form the corporation was presented to the plaintiff, and he was informed that only one share was to stand in his name, for the time being, so that he might be a director, and that, with the exception of four shares, to be

held by him and other parties, for the like purpose, all the shares were to stand in the name of the defendant, Henry E. Weaver, the principal financial man in the concern, as trustee, or were not to be issued, the plaintiff refused to sign the agreement. Thereupon his name was stricken out and that of another person inserted as a nominal stockholder to subserve the purpose of organization. After this the plaintiff continued to manage the business and the defendant to furnish money until the change of management, about December 1, 1902.

R. P. Pearson, the plaintiff, had been in the employ of the defendant Weaver, and certain mining and railway corporations, under the management of Weaver as president, in the capacity of civil engineer for some time preceding the starting of the business involved in this case. By reason of his capacity and information possessed by him concerning the business of Weaver and his corporations, his services for some time after he conceived the idea of the development of the property here in controversy were very necessary to his employers, and there is evidence tending to show that they dissuaded him from 'leaving their employment and starting on this venture, by offers to furnish the money for the development of the property upon fair and just terms. Pearson's interest in the property at that time consisted of a lease, dated October 6, 1898, for thirty-five years, authorizing him to mine the coal and manufacture into lime the limestone in two tracts of land, containing together 172½ acres, paying to the owner of the land a royalty of three cents a ton for the coal and one-half a cent per bushel for lime. He had no capital with which to develop this property. From about August 19, 1901, up until February, 1902, he brought this lease to the attention of Weaver, from time to time, and expressed great anxiety to begin work upon it, and represented to Weaver that other parties were willing to furnish the money. In February, 1902, he went to Chicago, taking the lease with him, and there made the agreement upon the faith of which all this money was expended. What that agreement was depends upon the testimony of himself, Weaver and C. A. Bickett, an associate of Weaver in his mining and railroad enterprises, and the subsequent conduct and admissions of the parties.

Pearson says that nobody was present when the contract was made except himself and Weaver, and that the latter proposed

to finance the concern as a joint stock corporation, to which the former objected, on the ground of the possibility of his being deprived of the control of the business; and thereupon Weaver explained the laws respecting the management and control of corporations and the danger to his private fortune of going into the business upon any other basis than that of a stockholder in a corporation, and closed with an offer to allow Pearson to hold fifty-one per cent. of the stock, which would enable him to manage and control the corporation. Weaver admits that he and Pearson were alone when the contract was made, but says that, upon its conclusion, Bickett was called in and informed of the terms of the agreement. Bickett substantiates this statement, and Pearson corroborates it in part by his admission that the lease and some other papers, which he had brought with him, were delivered into the hands of Bickett on that occasion. Bickett and Weaver both swear that they did agree to form a corporation; that the lease was to be the property of the corporation; that the stock was not to be divided, but held by Weaver in trust until the property was developed; that Weaver was to furnish all the money for that purpose; that he was to be repaid all that money before a division of the stock was made; that Pearson was to have, in the meantime, a salary of one hundred and twenty-five dollars a month; and that upon the repayment of Weaver's money the stock was to be divided into four equal parts, one to Pearson, one to Weaver, one to Bickett, and one to —Gardner.

At the date of the meeting, Pearson owned only the lease. Weaver and Bickett say it was agreed at that meeting that the fee in the property on which the lease was held should be purchased and ultimately conveyed to the corporation and the lease thereby extinguished. They say Pearson was distinctly informed that they would have nothing to do with the property unless this could be done. Pearson was authorized to purchase it, and did so, Weaver furnishing the money for that purpose. Other property adjoining this land was also purchased in the same way. These properties cost a little less than six thousand dollars. On March 31, 1902, about a month after the talk in Chicago, an option on the land on which Pearson's lease was taken was secured in the name of E. J. Billings by the procurement of Pearson, and assigned to the West Virginia Lime

and Cement Company, and delivered to Weaver. This act is corroborative of the statements of Weaver and Bickett, and inconsistent with the position now taken by Pearson. Pearson claims the property so purchased was to be the individual property of Weaver, held subject to the lease, and not the property of the corporation to be organized. The deed for the land was afterward made to Weaver, and Pearson explains that by saying Weaver had requested it, because the West Virginia Lime and Cement Company had not yet been incorporated, for which statement he vouches Weaver's letter. This is not at all inconsistent with Weaver's position, since it was necessary to put the title provisionally in the hands of some individual.

It is agreed that Pearson represented that the cost of putting the plant in operation would be about six thousand dollars, on the basis of putting in but one kiln. Bickett, at one time, suggested a six-kiln plant, but that was not carried out. Two were put in, and the total cost of the plant, exclusive of the purchase money for land, amounts to over twenty-three thousand dollars. A costly and possibly useless structure, put up as part of the plant, is a coal chute from the top of the mountain to the kilns. It cost about $10,000.00, and its satisfactory working is in dispute, as is also the value of the coal for use in the plant. But Bickett knew it was being put up. As before stated, the defendants furnished this money as demanded by the plaintiff, Pearson, and entrusted its expenditure to his ability, judgment and discretion. Many complaints were made from time to time by defendants of his failure to render accounts and send in reports. Assuming that attention to the work of erecting the plant and other outside operations were so exacting as not to allow him time for proper bookkeeping, auditing of claims and sending reports, the defendants directed one of their employes by the name of Thomas to go there and assist him. He declined the proffered assistance and went on in a manner unsatisfactory to defendants. He complains against the defendants of their failure to meet his pay rools promptly and furnish machinery and materials at the stipulated times, by means of all of which he was embarrassed in his operations. When the plant had been completed and was beginning to turn out lime, a difference as to the price at which it should be sold arose. Pearson had represented that it could be produced at a small cost and

sold in the vicinity of the place of manufacture at less than it could be bought elsewhere and still at a good price, so that the profits anticipated were from twenty-five to one hundred per cent. The defendants claim that lime was selling in the community at twenty-four cents. Pearson offered or sold some of the first product at fifteen cents. Bickett maintained that the price should be not less than twenty-two cents, urging upon Pearson the necessity of it in view of the large amount invested and the impossibility of raising prices after being once fixed, as well as the practibility of it, that being two cents cheaper than the price at which others were supplying it. A man by the name of Ferguson, an employe of the defendants in some of their enterprises, was sent to the plant and into the community to negotiate the sales, and it seems that some sales were made or offered by him at eighteen or nineteen cents.

Bickett made one or two trips to the plant and was assured by Pearson that his progress was 'good, and does not seem to have made, or to have been there long enough to make, any investigation. They relied upon Pearson. After the differences arose, and when it seemed to the defendants that the plant ought to be running and doing well, but was not, they sent John McFadyen, a man in whose business capacity and skill as an engineer they had confidence, to make an examination of the plant and report his conclusion as to its value. His report was not in all respects satisfactory, because it showed that the cost of manufacturing lime would be from seven to ten cents, considerably more than was estimated by Pearson. The defendants came to the conclusion also that Pearson's management was incompetent and extravagant, and they resolved to displace him as manager and did so about December 1, 1902.

It would be a work of great labor and of doubtful utility to review all of the correspondence and the testimony relating to these matters. Enough has been stated to show that the plaintiff and the defendants entered into an arrangement, looking to the development of a property of doubtful and uncertain value. Whether Pearson's lease was worth anything could only be tested by the expenditure of a large amount of money. Whether the investment of this money would prove to be worth anything to him or its owners no man could tell without the test, a costly experiment. Though Pearson does say other per-

sons had offered the means to test the property, he does not indicate who they were or upon what terms they contemplated investing their money with him. His lease being valueless without the expenditure of a large amount of money, which he did not have, and the result of that expenditure by the defendants being a matter of great uncertainty, as is almost any other mining venture, the agreement as contended for by the defendants is not unreasonable. It gave Pearson a salary of one hundred and twenty-five dollars a month, saved to him one-fourth of his lease, and gave to him one-fourth of all the property purchased, and made the arrangement appear to be feasible and businesslike in its outlines. Assuming that he was competent as a manager, there was ample capital then behind the enterprise, and there was no reason why, in case the property should prove valuable, the business might not go on successfully. Though the money invested by Weaver and his associates was all to be returned out of the earnings of the plant, before any division of the stock should be made or dividends declared, Pearson was to have his salary, the royalties in his lease were to be cut off and saved to the company, and nearly four thousand dollars' worth of other property was purchased for the company. It would be difficult to understand how sagacious business men, such as Weaver and his associates are shown to be, could be induced to put money into such an enterprise to an extent limited only by the requirements of the business, without an understanding that it should be returned to them. On the basis contended for by the plaintiff, the most ordinary, even inferior, business foresight, would demand that the amount to be contributed be limited in advance and balanced, on some sort of valuation, against the property contributed by the other party. It is incredible that these defendants should bind themselves to furnish the money necessary to buy all this property and put up the plant, without fixing any limit upon the amount with the understanding that the plaintiff, contributing only the value of his lease, should own fifty-one percent of it when completed. He says the defendants were not bound by the contract to purchase the fee in the land and the other lands, and that they did so of their own volition. This was a most remarkable exhibition of generosity, for the evidence undoubtedly shows that the property so purchased was to become the property of the com-

pany. If not, why did Pearson cause the option to be assigned to the company and not to Weaver individually? Some of Pearson's letters are inconsistent on this point. On March 21, 1902, he wrote Bickett, saying, among other things, "For the last time, either carry out your promise and buy out the property as outlined in our last interview; or if you think my services worth the price, pay me $6,000.00 for the lease of the Hendricks business and then exclude me from its respansibilities, and pay me an ample salary for the overseeing of your future operations here, and do it before the 1st prox. I am tired of promises." What purchase could he have referred to, less than a month after the Chicago interview, other than the purchase of the fee in the land on which he had the lease? How can he reconcile this with the pretension that that purchase was made by Weaver and his associates of their own volition and not in pursuance of the agreement made in Chicago? In his attempted explanation of this inconsistency he does not say he did not refer to that purchase, nor attempt to repel the inference arising from it as to what the contract was, but goes off into a long unintelligible rambling discussion of other matters, complaining of delays and making accusations of noncompliance with his promises as to the time within which certain things were to be done. As a circumstance, raising an inference against the position of the defendants, he relied upon the fact, that at the time of the purchase of the land on which the lease was, an abstract was shown to Bickett from which it appeared that the land was subject to that lease, and that the deed was made subject to that lease, facts which all the parties knew. In the hands of the owners and grantors in the deed, of course the land was subject to the lease, and in conveying it, they could not afford to put in a warranty without excepting the lease. If Bickett and Weaver were relying upon their contract, made in Chicago, these facts could make no difference and were not calculated to excite any comment, or induce any different course of conduct on their part, for they understood that both the lease and the land were to become the property of the company. It is not pretended that, at that time, they had received any notice from Pearson that his contention as to the Chicago agreement was different from theirs. He does not pretend that any notice of that kind had been given them.

The first act on his part, charged as being inconsistent with their claim, was his refusal to sign the agreement to incorporate in June, 1902. He does not say he even then gave notice of a claim of fifty-one per cent. of the stock. When asked what he had said to Mr. Robinson, who presented the agreement for his signature, he replied as follows: "I declined to sign them, and when pressed for the reason gave it to Mr. Robinson; told him about my lease and that when I got my stock I would assign the lease just as was intended in Chicago." In his examination in chief, he says he refused to sign because they had not allotted his fifty-one per cent. of the stock, but does not say he told Robinson he claimed that much. There is, therefore, in the record, nothing to show that the defendants had notice of the full nature and extent of the claim he now makes, until after he had been ousted from the management of the business. With the single exception of his refusal to sign the articles of incorporation, no act of his, up to the date of his ouster, was inconsistent with the contract as claimed by defendants. On the contrary, with the exception of his refusal to accept the assistance of Thomas, he seems to have been submissive to the will and instructions of the men who were furnishing the money. In a letter to Bickett, dated July 21, 1901, he said: "The main point I want you to be impressed with in regard to your letter is that neither now nor any time in the future need you have any apprehension as to my acting hastily or injudiciously in regard to sales or financial matters here. You have far more experience and sagacity than I have in such matters, and no one appreciates that fact more than I do, and I am only too pleased that our little corporation has a right to all benefits arising therefrom."

After having examined all the evidence, much of which can not be set out here for want of space, we are clearly of the opinion that the agreement made in Chicago is not what it is claimed, by Pearson, to be, but is substantially what it is claimed, by the defendants, to be.

After he had been deprived of the management of the plant and property, Pearson brought this suit in equity, setting out in his bill his pretentions and claims substantially as hereinbefore stated, and praying alternately that the charter of the West Virginia Lime and Cement Company and its pretended

organization be declared nullities, or, if that could not be done, that his interest in the corporation be ascertained and fixed at fifty-one per cent. of the capital stock; that Weaver, Ferguson, Bickett, Stern and Robinson, the corporators of said company, be declared trustees, to hold said fifty-one per cent. of stock for his use and benefit; that they be required to deliver the same to him; that a special receiver be appointed to take charge of the property pending the suit, with full power and authority to preserve from waste and injury, and operate, said plant; that the defendants, their agents and servants, be required to turn the same over to the receiver; and that they be enjoined from in any manner interfering with the property. The bill also prays for general relief. Upon the bill, a receiver was appointed and an injunction awarded. The defendants appeared, filed their demurrer and answer at March rules, 1903. The answer denies the material allegations of the bill, charges incompetency and extravagance on the part of the plaintiff as manager of said works, and sets forth the claims and contentions of the defendants, as to their rights and interests in respect to the property, substantially as hereinbefore stated, except that they claim that the property purchased, and standing in the name of Weaver, is not to be conveyed to the corporation until after the plant is completed, the business thoroughly on its feet and their money fully returned to them, and that the delivery to them of plaintiff's lease was intended to, and does, operate as an assignment to Weaver to be also held in trust with the land. Several unimportant interlocutory orders were made from time to time, and on the 1st day of December, 1903, a decree on the merits was entered, whereby the court ascertained and adjudged that, by the verbal agreement between the parties, the plaintiff had bound himself to contribute his lease and Weaver to contribute a sufficient amount of money to erect and complete the plant for the manufacture of lime and to open the coal mine on the lands; that the West Virginia Lime and Cement Company had been duly incorporated; that by the terms of the verbal agreement the plaintiff was to receive, as consideration for his lease, fifty-one per cent. of the capital stock and Weaver, the remaining forty-nine per cent; that Weaver did advance sufficient money; and that he had refused to give the plaintiff the stock to which he was entitled.

Thereupon it was adjudged, ordered and decreed that fifty-one per cent. of the capital stock be issued to the plaintiff, and the residue to Weaver and his associates; that Weaver was the owner in fee of the land and entitled to receive the royalties as they may acrue from the lease; that upon the issuance to the plaintiff of fifty-one per cent. of the capital stock, he assign and transfer to said corporation his lease. The receiver was ordered to deliver posession of the property to the corporation, and it was further ordered that upon such delivery his powers should cease. His compensation was fixed at six hundred dollars and decreed against the corporation, and the cause was referred to a commissioner to ascertain and report whether there are any liens upon the lease, and upon the property and stock of the corporation, and to audit and settle the acounts of the special receiver.

From the finding of the facts already stated, it is apparent that this decree is erroneous, and that the principal errors are in decreeing to plaintiff fifty-one per cent. of the capital stock and adjudicating the land purchased to be the property of Weaver. We do not think, however, that the evidence fully sustains, in all its details, the claim of defendants. They say no property was to be conveyed to the corporation, and that no stock was to be issued, until all their investment had been returned out of the profits of the enterprise, but that all was to remain in Weavers' hands as trustee. This claim is contradicted by Weaver's letter to Pearson, directing the Baker land to be conveyed to him, because the corporation had not, at the time of its purchase, been chartered and organized. This fact shows that the property was to be conveyed to the corporation, as soon as organized and ready to receive the title. It is not to be assumed that the corporation was to own part of the property, while another part was to be withheld from it in trust, without any reason therefor. And it would be inconsistent with business principles to convey the property to the corporation, without receiving anything in return for it. Consistency in the claim of the defendants, also denies the proposition that no stock was to be issued; for a corporation, receiving property or funds without issuing, or recognizing any title to stock is a sort of anomaly, not to be established except by very clear, consistent and positive evidence. We think the trust arrangement in the

agreement was only to continue until the organization of the corporation, and that, upon its organization, the stock was to be issued to the persons, and in the proportion, hereinbefore stated, namely, one-fourth to Pearson, and the remaining three-fourths to Weaver and his associates, in consideration of property conveyed and credit extended. As the corporation is charged with all the money laid out and expended by Weaver and his associates, the value of the stock, in the hands of all the parties is dependent upon future development, as contemplated by the agreement. No reason is perceived why Weaver and his associates should hold the title to Pearson's stock, since their outlay is a charge and an indebtedness against the corporation, rendering all the stock less valuable to the extent of that outlay, in whosoever hands it may be. It is also inconsistent to say that Pearson's stock should be specially pledged to the repayment of the corporation's debt.

Though not entitled to all the relief given him by the decree, the plaintiff is clearly entitled to have specific performance of the contract for the purchase of his lease, conveyance of the land and an adjudication of his right to said twenty-five per cent. of the capital stock of the corporation as aforesaid, and the same issued and delivered to him upon the assignment of the lease and conveyance of the other property. No adequate legal remedy for the vindication of his rights in these respects is perceived. The contract contemplates the full and complete development of a property which seems to have considerable merit and value as a mining property. It embraced among its provisions the vesting in him, as a stockholder, of a beneficial interest in real estate, not only as to the interest in his lease, so indirectly to be retained, but also in the property purchased for the corporation by Weaver and his associates. It is needless to say that equity has jurisdiction to enforce specific performance of almost all kind of contracts, relating to real estate. See *West Virginia etc. Co.* v. *Vinal,* 14 W. Va. 637; *Oil Co.* v. *Oil Co.,* 47 W. Va. 84; *Bettman* v. *Harness,* 42 W. Va. 433; 26 Am. & Eng. Ency. Law (2d Ed.) 104. No question is made as to whether the plaintiff has put himself in position to call for such relief by performing his own duty and demanding performance by the defendants. The demurrer is not insisted

upon here and the appellees seem to desire a decree deter-
mining the rights of all parties interested.

Why there should be any reference as to liens is not perceived.
Nobody has asserted and asked enforcement of any liens by any
pleadings in the cause. A reference for the settlement of the
accounts of the special receiver may become necessary, but no·
cause for it appears as yet. No exception to any items of his
report is disclosed by the record. His bill for services, amount-
ing to six hundred dollars was excepted to and its excessiveness·
is here admitted by both sides. The claim is not itemized and
the court had nothing before it from which the true character
and amount of the services could be determined, and no evi-
dence was adduced in support of the claim. Its allowance is,
therefore, erroneous, but upon an itemization and proof of his
services, the court can, without difficulty, fix the amount of .
his compensation, and no reference for that purpose is neces-
sary. References are expensive and should not be made with-
out cause.

For the reasons stated, the decree complained of will be re-
versed and the cause remanded with directions to decree an as-
signment by the plaintiff of his lease to the West Virginia Lime
and Cement Company and a conveyance to said corporation, by
the defendant, Henry E. Weaver, of the land purchased, as·
hereinbefore stated, for it, and, by such proper orders as may be
necessary, to cause such assignment and conveyances to be made
and also to require the defendant, the West Virginia Lime and·
Cement Company, upon such assignment and conveyance be-
ing effected, to issue and deliver to ·the plaintiff certificates for
one-fourth of its capital stock, fully paid and non-assessable;·
and for such further proceedings, acording to the rules and prin-
ciples of equity, as may be necessary to secure and protect the·
rights and interests of the parties under their said agreement..

*Reversed.*