## CHARLESTON.

CHARLES E. BLUE *v.* HAZEL-ATLAS GLASS COMPANY

(No. 6199)

Submitted January 22, 1929.   Decided February 5, 1929.

*J. M. Ritz* and *Geo. C. Beneke,* for appellees.

*R. S. Spilman, Price, Smith & Spilman* and *Hubbard & Hubbard,* for appellant.

WOODS, PRESIDENT:

This suit, which was instituted in 1921 for a discovery and an accounting of all the glassware made by defendant on certain machines furnished by the plaintiff, and to recover such royalties as the plaintiff might be found entitled to, is based upon a contract, dated December 27, 1900, entered into between (Charles E. Blue (and others to whose rights and obligations thereunder he has succeeded) and Hazel Glass Company (to whose rights and obligations thereunder defendant, Hazel-Atlas Glass Company, has succeeded).

The first section of the contract of 1900 made provision for royalties on the machinery then in use by the defendant company. The second and third sections (upon which this suit is based) provide:

> "Section 2. If the said parties of the first part succeed in manufacturing for the Hazel Glass Company, party of the second part, an automatic glass feeding machine, which will require no more than one skilled and one unskilled workman to operate, and which machine shall be accepted in writing by the Hazel Glass Company, it, the said party of the second part, agrees to pay to the parties of the first part an additional royalty of two cents per gross on articles up to and including sixteen ounces capacity and an additional royalty of five cents per gross on articles over and above sixteen ounces capacity, and the said party of the second part further guarantees that the minimum payment to the parties of the first part, in royalties for any year for articles manufactured under this section of this agreement during that year shall be not less than Six Thousand Dollars ($6,000.00) additional. Provided that while the agreement to pay the additional royalty shall go into effect immediately on the acceptance of said feeding machine in the manner aforesaid, the guaranteed minimum payment under this section of Six

Thousand Dollars per year shall not go into effect until the second year of working said machine.

"Section 3. If the said parties of the first part succeed in manufacturing for the Hazel Glass Company, party of the second part, an automatic machine for making glassware that will require no more than one unskilled laborer to operate, and which machine shall be accepted in writing by the Hazel Glass Company, it, the said party of the second part agrees to pay to the parties of the first part, a royalty of four cents per gross on all articles up to and including sixteen ounces capacity, and a royalty of ten cents per gross on all articles over and above sixteen ounces capacity, and the said party of the second part further guarantees that the minimum payment to the parties of the first part, in royalties for any year for articles manufactured under this section of this agreement during that year shall be not less than Twenty Thousand Dollars ($20,000). Provided that these royalties and minimum guarantee, shall take the place and be in lieu of royalties and guarantees provided to be paid under sections one and two of this agreement. And provided further and it is mutually understood and agreed that the Hazel Glass Company shall have accepted in writing and have had in operation at least seven of these machines for a period of one year before the minimum guarantee of twenty thousand dollars shall go into effect or become payable under this section of this agreement. And provided further that said minimum guarantee of twenty thousand dollars ($20,000) per year, shall continue for a period of five years, after which period said minimum guarantee may be discontinued or continued at the option of the Hazel Glass Company, party of the second part."

The remaining sections provide for the cost of experimental machinery; the interest to be transferred to defendant in all patents; the reduction of minimum royalties under certain conditions; and the time for payment of royalties.

The amended bill alleges that the plaintiff, prior to the execution of the contract in question, had secured several

patents on machinery used in the moulding of glassware, and was a stockholder in the Atlas Glass Company which merged in 1902 with the Hazel Glass Company and others, as the Hazel-Atlas Glass Company; that at the time of the making of the contract of 1900, the Hazel Glass Company was using his glassmaking machines in its factory, for the use of which it was paying plaintiff a certain royalty; that plaintiff at the time had in mind a machine that would answer the requirements of sections 2 and 3 of the contract; that the company continued to pay the royalties provided for in section 1 of said contract until 1914, at which time the patent rights ran out on the old machines; that he furnished a machine which fulfilled all requirements of sections 2 and 3, and that same has been tried and accepted by Hazel-Atlas Glass Company; that prior to 1907, one Brooke obtained a patent for severing a continuous flowing stream of glass, without disclosing any practical means in the patent for severing said stream of glass; that an option was taken on the ''Brooke patent'' to avoid possible infringement suits, and that plaintiff released his rights thereunder to defendant, who obtained a license to use same; that defendant became a licensee under plaintiff's patent and has continued to use and to be a licensee to the present time; that he does not know how many machines defendant has or is using, etc.; and then concludes with a prayer for a discovery as to the time when the defendant started to use said appliances, the various places where used, and the amounts of glassware manufactured, and that the liability of the defendant to the plaintiff be ascertained, and for general relief. The contract heretofore referred to was attached to and made a part of the bill.

Defendant answered denying that the plaintiff ever furnished it a machine complying with the requirements of sections 2 and 3, or that any such machines were ever accepted by or commercially used by it; and it denies that plaintiff ever obtained an option to purchase the Brooke patent or released same in favor of defendant. The answer also charges laches.

The decree of the lower court, after finding from the mass of evidence that defendant company accepted plaintiff's

machines in March, 1907, and had used them to the time of the institution of this suit, made the further finding that "under the facts and circumstances of this case said machines substantially comply with the requirements of section 3 of the contract", and that the defendant is liable to plaintiff for the "minimum royalties specified and provided in said section 3 of said contract" for the period used, and decreed in accordance therewith that plaintiff was entitled to $300,000.00 and costs. It is from this decree that the defendant glass company appeals.

Are the findings of the lower court supported by the evidence? While the glass company contemplated a greater output by virtue of any machine that might be constructed under the contract, yet that was not all, for it incorporated therein as one of the conditions that the "skilled" laborers were to be dispensed with, and that any machine found satisfactory should be accepted by them in writing. So, the lower court in finding a substantial compliance must have found that the "skilled" laborers had been dispensed with. We find no judicial definition to guide us in determining who is a "skilled" or an "unskilled" laborer so far as the same pertains to glass workers. So, we must resort to the contract in an endeavor to determine in what sense the words have been used. It assumes that the "gatherer" and the "presser" are "skilled" laborers.

The Blue machine in use in 1900 had a table capable of rotation. This table carried a plurality of molds in which the several operations necessary to construct a bottle, jar, or other vessel, were respectively performed. After the machine began turning out a finished article, a finished article was produced at each movement of the mechanism. While that machine was automatic in a sense, yet it required the presence of a "presser", who, after cutting off the proper amount of glass into the mold, was called upon to move the presser head up and down through the medium of the lever, press down the foot-piece and turn the table. As he performed these various duties, the machine, by reason of its construction, was performing the various stages of blowing, etc., to

the discharging of the finished product. A "taking-out" boy, however, was employed to take the ware from the machine, and a "carrying-out" boy, to transport the same to the lehr. In Blue's endeavors to avail himself of the royalties provided in the contract of 1900, by doing away with the "presser", he provided for certain automatic attachments, one to cut off the glass, so that it would drop into the machine at the charging position, another to rotate the table in a proper manner, and another to operate the pressing, blowing and discharging mechanism. The operation of the various parts of the machine was controlled by a continuously rotating master-shaft with a plurality of cams, each cam being adapted to operate a valve, which, together with other mechanism, operated the several new automatic attachments. Had these new attachments proved practicable, it would only have been necessary to have dropped the molten glass into the mold at the charging point, the intervening operations being performed automatically and at the proper time by the setting of the cams upon the master-shaft to act upon their valves in proper sequence. Such a machine, if workable, would have done away with the "presser". But out of the five proffered attachments but two proved practicable, and those only after they had undergone material changes.

Practically all of the testimony is to the effect that the presence of the "gatherer" was not dispensed with through any of the plaintiff's proposed attachments, but through the use of the Brooke device, which was used under a license from its inventor, in connection with other mechanism provided by Goode from the Clarksburg factory. And, when we compare the duties of the old "presser" with those of the "operator-presser" on the Blue machine with the two automatic attachments, we find that the latter "has so much more to do and to look after on the press than the old time presser would have to do." Such operator must be able to regulate the heat of the glass, shape the glass for dropping it into the blank mold; regulate the heat of the plunger, mold and blank; regulate the wind on molds and blank; regulate the heat of the shears and the finished product; manipulate the

table; put in the blank; know the requisite oiling of the blanks and molds, plunger and shears. Too much oil or too little oil affects it; the former leaves a deposit on the glass form; too little, the gathering will go to the bottom of the blank, and as a result there is not a proper distribution. As expressed by one witness, "He is continually watching the ware which he is making, by paying close attention to his weight in glass; he must watch his water on the plunger; he must watch his air on the different valves; and he must watch the wind on his molds, the blank molds; and also keep his eye on his molds to see that they are in good condition to make ware. He has to watch his gas and air or wind on which we call the flow spout or the gatherer, the gathering-boy." He also moves the table and puts in the blanks. Both the old "presser" and the "operator-presser" required on the Blue machine with the two automatic attachments were required to use their intellectual faculties in their respective capacities, and the quality of the ware produced on the original Blue machine, or the original machine with the automatic attachments, depended entirely upon the ability of each laborer to properly manipulate his machine. From the record it appears that there was a mere substitution of another laborer called an "operator-presser" for the "presser". While it was contended in argument that a great deal more ware was made under the new conditions, and that in that sense the contract has been complied with, we must remember that the automatic features covered by the contract contemplated not only an increased production, but a different type of help—an "unskilled" rather than a "skilled" laborer. And, also it must be remembered that the increase was brought about by the use of the Brooke flow feature in conjunction with Goode's device. There is testimony that under old conditions some times two "gatherers" would be used to supply a good "presser" with molten glass.

A machine with automatic attachments, believed and claimed by Blue to be fully automatic and complying with all the requirements, was delivered to defendant company for experimental purposes, in 1903, and was experimented with from time to time. In January, 1907, we find Blue writing

the Hazel-Atlas Company that it was to have the "use of the three machines for three months", and that if it was satisfied more machines would be installed on a royalty basis. Certain production sheets were introduced covering a test period in March, 1907, which date the lower court set as the date of defendant's acceptance. The plaintiff also introduced a copy of an unexecuted agreement, prepared by Blue's attorney from a pencil notation made by W. S. Brady, a director of the Hazel-Atlas Company, at a New York conference to which Blue was a party, to support the contention that there had been an acceptance. Both the agreement and notation, among other things, contain a recital to the effect that Blue had succeeded in constructing a machine carrying into effect the terms of sections 2 and 3 of the contract of 1900. Neither of said writings, however, were ever authorized or approved by the board of directors of the Hazel-Atlas Company. We do not find such an acceptance as required by the contract of 1900. We have given our approval to the rule that where a person contracts to manufacture articles or do work to the satisfaction of another, such other is, under this view, the sole judge of the quality of work done, and his right to accept or reject it is absolute, conclusive and binding upon the parties, without the investigation of his reasons, unless he acts fraudulently. *Barrett* v. *Raleigh Coal Company,* 51 W. Va. 416. Blue stated that after December, 1907, he didn't think there was any question in regard to the operation of the machine, and admits in correspondence that in connection with the "three machines" charged to Hazel-Atlas Company by invoice of 1907, that the delay in payment would not prejudice them about accepting the contract. Through all the years from 1907 to 1914 Blue received his royalty under section 1 of the contract without any demand for additional royalty under the other sections of the contract. Here is a contract that under the performance of certain things by Blue he was to have an additional minimum royalty paid to him. He is basing his claim at this late day upon an isolated use of his mechanical appliances in 1907. Yet, knowing this use by the Hazel-Atlas people of such appliances, the record contains no evidence of even a suggestion to them of additional

minimum royalties accruing to him. Here was a contract that provided that the appliances to be furnished by Blue were not to call for additional royalties until the Hazel-Atlas people had accepted them in writing. He knew of this condition. He knew that he had tendered certain appliances to them for trial. Yet he makes no inquiry. While delay in the assertion of a right may not within itself be sufficient to defeat it, yet it does raise a presumption of intent to abandon the cause of action. Such non-action tends to cast doubt on the existence of the right. *White* v. *Bailey*, 65 W. Va. 573. At no time after the delivery of the attachments by Blue did the defendant find them sufficient to be accepted as a compliance with the terms of the contract. Much of the record is taken up by the plaintiff in reiterating the belief that he has substantially complied with the requirements of the contract. Intent to perform, and partial performance, and an honest belief that there has been a substantial performance, are not enough. *Blakeslee* v. *Holt*, 42 Conn. 226. Such is not proof. What has been lawfully agreed to be done must be shown to have been actually done to give a party standing in a court of law or equity.

But the plaintiff also claims certain of the provisions of sections 2 and 3 to have been waived by the Hazel-Atlas Company. Of course a waiver may be express or it may be inferred from actions or conduct, but all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist. 13 C. J. 671. The party to a contract is guilty of the first breach who fails to do what he contractually is bound to do. *Emack* v. *Hughes*, 74 Vt. 382. The mere fact that one party to the contract does not terminate it on a breach by the other party of its provisions does not establish a waiver.

In view of our holdings to the effect that a decree determining a question of fact will be reversed where it clearly appears to be against the weight of the evidence, or where such finding is inconsistent with what the evidence on the whole clearly shows was intended to be the relation of the parties toward one another, we must reverse the decretal judgment in this case. *Hendrick* v. *Jenkins*, 104 W. Va. 486;

*Wallace* v. *Douglas,* 58 W. Va. 102; *Pearson* v. *Lime & Cement Company,* 56 W. Va. 650.

The plaintiff clearly is not entitled under the proof to the minimum royalty under sections 2 and 3 of the contract. The decree is therefore reversed and the cause remanded.

*Reversed and remanded.*