**William Knapper BLACKHURST,**
**Plaintiff,**

**v.**

**E. I. du PONT de NEMOURS AND COMPANY, a corporation, Defendant.**

**Civ. A. No. 3278.**

United States District Court
S. D. West Virginia,
Charleston Division.

March 22, 1968.

---

13. For the provisions of section 8c(5) (G), see note 12 above. See also *Lehigh*, 370 U.S. at 91 et seq., 82 S.Ct. 1168.

Rudolph L. Di Trapano, Di Trapano, Mitchell & Maroney, Charleston, W. Va., for plaintiff.

Howard R. Klostermeyer, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

The plaintiff instituted this action against the defendant to recover damages for breach of an employment contract, alleging that his employment was terminated shortly before he would have become eligible for certain pension benefits and the failure to accord him the seniority to which he was entitled with respect to re-employment by the defendant. The defendant filed its answer denying any and all liability to the plaintiff, and thereafter filed a motion for summary judgment, which motion was supported by certain affidavits and exhibits. The plaintiff, Blackhurst, has filed a responsive affidavit, and his discovery deposition, as well as the deposition of C. P. Wilson, Personnel Supervisor of defendant's Belle plant during the period in question, has been filed in this case. A review of all of this material indicates that no genuine issue exists with respect to any material facts and the motion for summary judgment may therefore properly be considered. The facts relevant to the disposition of the motion are as follows.

The plaintiff was born April 29, 1899, and was first employed by the defendant at its Belle Works on June 12, 1944. He was initially employed in the labor pool but worked as an operator's helper from June, 1944 until April 30, 1946, when he was laid off due to a lack of work. He was re-employed on June 10, 1946 and thereafter worked in various capacities as a millwright helper and laborer until his employment was terminated as of April 17, 1959. However, for several months prior to his termination he did only light work such as janitorial services and carrying lunches. In 1957, the Belle plant had accumulated an excess of employees in its labor pool due to the completion of a construction program and modernization of its production facilities. As a result the defendant found it necessary to terminate the employment of 762 employees between the period of November of 1957 and June of 1959. The plaintiff was one of those whose employment was terminated during this period, and all of the employees were terminated in the order of plant seniority in accordance with the procedures set out in a book entitled "General Practices and Policies for Wage Roll Employees, September 1, 1958." Of these 762 employees, approximately 120, including the plaintiff, had 14 years or more of service with the defendant at the time their employment was terminated.

The plaintiff was given written notice on April 7, 1959 that his employment would be terminated on April 17, 1959.

On the latter date, the plaintiff was given a termination form letter which indicated that he had 14 years, eight months and 27 days of Company Service which entitled him to severance pay in the amount of $1,280.30. It also reflected a vacation pay allowance for three weeks in the amount of $260.40 and, additionally, carried a statement with respect to the expiration dates of plaintiff's group accident and health insurance and group life insurance.

On April 7, 1959, the date of plaintiff's notification of termination, defendant had in effect a voluntary noncontributory pension and retirement plan which provided that an employee would be eligible for a retirement pension if he retired after reaching age 65 and had a minimum of 15 years of continuous service immediately prior thereto, or if he voluntarily retired after reaching 60 years of age and had at least 30 years of continuous service immediately prior to such retirement. On April 13, 1959, six days after the plaintiff had been notified of his termination, the defendant's pension and retirement plan was amended to initiate vested pension rights after 15 years of continuous service. Under the amended plan an employee would become entitled to a vested pension right if his employment were terminated on or after April 13, 1959 for any reason other than retirement and provided further "he has had at least 15 years of continuous service immediately prior to termination." From June, 1959 until March, 1962, the defendant did not hire any new wage roll employees, and during that period lost by retirement and otherwise about 179 such employees. In March of 1962, the defendant determined that it was necessary to hire additional men qualified to perform hard labor including labor in the Urea Division. In the meantime, the defendant had established a Committee to consider applications for employment of former employees. These applications were first reviewed by C. P. Wilson, Personnel Supervisor, who, in turn, checked the medical history of the applicant with Dr. J. H. Thornbury, Medical Superintendent, and thereafter recommended acceptance or rejection of the application. The Committee made the final decision with respect to the employment of all former employees. The plaintiff had periodically filed applications for employment and his application, along with those of other former employees, was processed and considered by the Committee.

Pursuant to this program, during the period from March of 1962 until May of 1964, approximately 180 persons were employed in the labor pool at Belle. Of this number, 99 were former employees and 81 were new employees, and all had been determined by the Committee to have the capability of performing hard labor including labor in the Urea Division. Twenty-three former employees, including Blackhurst, all of whom had between 14½ and 15 years of Company Service applied for re-employment during this period. Two of these were rejected because of unsatisfactory work records and 12, including Blackhurst, were rejected because the Committee determined that their medical records indicated that they were not physically able to perform hard labor. The remaining nine were offered employment, three of whom rejected the offer, two were disqualified upon medical examination and the remaining four returned to work at Belle. Of these four, two had less service with the Company than the plaintiff and the other two had more service to their records.

The plaintiff's medical record indicated that as early as 1948 he was treated at the Company dispensary for moderate hypertrophic arthritis throughout his lumbar spine and, in fact, the plaintiff lost some two months' work in 1948 by reason of this condition. In 1949, the plaintiff was rejected for labor duty in the Urea Division because of his back condition and this rejection for such service was reviewed in 1950 and affirmed. In October, 1954, an X-ray taken at the Belle dispensary showed marked hypertrophic changes in the vertebral body of plaintiff, and in the years

1955 through 1958, the plaintiff was repeatedly treated at the dispensary for back pain. On February 11, 1959, the plaintiff was again found to be disqualified for work in the Urea Division by reason of his back condition.

The record indicates that the plaintiff's application for re-employment was considered by the Personnel Supervisor, the Medical Superintendent, the plant managers and the full Committee at the Belle plant. Additionally, at the request of his son, the application of plaintiff was reviewed by several of the top management officials of the defendant at its headquarters in Wilmington, Delaware. The plaintiff also applied to the Board of Benefits & Pension by letter dated April 27, 1964 for a pension based upon his continuous service as reflected in his termination letter, but this application was denied on May 19, 1964 inasmuch as the plaintiff did not meet the eligibility requirements of Section IV. A or Section V. A of the Pension Plan.

The record clearly shows that the plaintiff had less than 15 years of continuous service with the defendant and, accordingly, meets neither the eligibility requirements of the Pension Plan which became effective on April 13, 1959, nor the conditions of the Pension Plan which was in effect prior to April 13, 1959. Under the circumstances, the only issue presented on this motion for summary judgment is whether or not Blackhurst had any contractual or vested right to be re-employed by the defendant when hiring for the labor pool was resumed in March of 1962, and further to continue in its employment until such time as he could accumulate the requisite years of continuous service to become eligible for a pension.

The circumstances of the plaintiff's employment constituted only an indefinite hiring arrangement which was terminable at the will of either party, and a discharge under such an arrangement does not constitute a breach of contract which would entitle the plaintiff to recover damages. Even if we were to indulge in the assumption that the plaintiff was motivated or persuaded in his own mind to continue his employment in order that he might qualify for retirement benefits under defendant's pension plan, this in itself would not constitute an adequate consideration to support a contract which would entitle the plaintiff to recover damages for the termination of his employment by the defendant even though such termination might have been effected shortly prior to his qualification for a vested pension.

The case of Wright v. Standard Ultramarine & Color Co., (1955) 141 W.Va. 368, 90 S.E.2d 459, is directly in point on this aspect of the controversy. In that case the plaintiff had been employed by the defendant for 36 years, and on December 1, 1950 the company had established a retirement plan under which eligible employees would receive benefits at the age of 65. Under the plan if the employment of a participant was terminated after his fifty-fifth birthday, the participant was entitled to vested retirement benefits at the age of 65 in the event he had 20 years of continuous service at the time of his termination; however, if employment was terminated prior to age 55, the employee would receive nothing under the plan. The plaintiff alleged that on December 15, 1952, he had received a letter from the defendant to the effect that his future compensation would consist of salary and retirement plan benefits, and that while he had intended to leave the defendant's employment, he did not do so because the plan gave him assurance that he would receive retirement income. The plaintiff further alleged that he would have become entitled to vested rights under the plan on November 3, 1954 when he would have attained the age of 55, but that the defendant summarily and without cause discharged him on March 18, 1953 to relieve itself of its obligations under the retirement plan, and that this action constituted a breach of plaintiff's contract of employment. Plaintiff sued to recover salary, fringe benefits and the value of the retirement income of which he was deprived. In

holding in favor of the defendant-employer the Court stated at page 381 of the West Virginia Report, 90 S.E.2d at page 467:

"Though the special count also contains the allegations that when the retirement plan was established the plaintiff had 'the understanding and agreement with the said company that as long as he properly performed his duties he would be continued in such employment;' and that 'under such circumstances and in the light of the agreement between them as aforesaid there came into existence a valid contract upon which there had been a meeting of the minds and which was not subject to being broken or disregarded;' there is no allegation of any consideration for such agreement, or of its terms and provisions, or of its duration for any definite period of time. There is no allegation that the plaintiff paid anything or gave any consideration for any contract for his employment by the defendant, permanently or as long as his services were satisfactory to it, or that he made any payment for or under the retirement plan. On the contrary the special count alleges that the defendant 'paid the premiums upon the said retirement plan.' Ordinarily a contract of employment for as long as an employee satisfactorily performs his duties is of indefinite duration and terminable at will by either party unless such contract is supported by a consideration other than the obligation of service to be performed by the employee and the obligation of the employer to pay wages or salary for such service. 56 C.J.S. Master and Servant § 31."

And at page 382 of the West Virginia Report, 90 S.E.2d at page 468:

"Under the law governing the relation of master and servant, an employment unaffected by contractual or statutory provisions to the contrary, may be terminated, with or without cause, at the will of either party to the contract of employment. Bell v. South Penn Natural Gas Company, 135 W.Va. 25, 62 S.E2d. 285; 56 C.J.S. Master and Servant, § 31. When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract. * * * 'An employment upon a monthly or annual salary, if no definite period is otherwise stated or proved for its continuance, is presumed to be a hiring at will, which either party may at any time determine at his pleasure without liability for breach of contract.' Point 1, syllabus, Resener v. Watts, Ritter and Company, 73 W.Va. 342, 80 S.E. 839, 51 L.R.A.,N.S., 629. * * * A special count in a declaration in an action of assumpsit, which sets forth no valid contract of employment of the plaintiff by the defendant other than a contract of employment at the will of either party to the contract, and in which count the plaintiff seeks to recover from the defendant on such contract damages which result from the act of the defendant in discharging the plaintiff from such employment, does not sufficiently state a cause of action against the defendant and is insufficient on demurrer."

The plaintiff here, however, contends that he had certain absolute seniority rights for re-employment under the provisions set forth in the pamphlet dated September 1, 1958 entitled "General Practices and Policies for Wage Roll Employees." While the import of the provisions of this pamphlet would seem to be merely a general statement of practices and policies of the defendant-employer rather than contractual terms of employment of which the plaintiff might have the benefit, it would appear in any event that the plaintiff was in fact accorded all of the rights which he might have had thereunder. There is no indication in the record that in reducing the number of employees in the labor pool in the year 1959, the defendant violated the seniority rights of the plaintiff, but on the other hand, defendant clearly complied with Section II–E–1–c of the

pamphlet provisions. Indeed, it would appear that the plaintiff does not quarrel with the manner of his termination, but takes the position that the Company had an absolute obligation to re-employ him in the order of his plant seniority. The applicable provisions with respect to this contention are set forth in Section II–A–8 in the following language:

"8. Re-employment—Employment

"If posted job vacancies cannot be filled by qualified employees through the posting procedure, vacancies may be filled by the employment of other applicants. Applicants from outside the Plant will be considered for employment in the following order:

"a. Former Employees Off Less Than One Year

Former employees whose date of termination because of lack of work is within one (1) year of the date of the vacancy. Consideration for re-employment shall be in order of PLANT seniority held at the time of termination.

"b. Former Employees Off More Than One Year

Former employees whose date of termination because of lack of work is more than one (1) year prior to the date of the vacancy, providing that, at the time of the vacancy, they have on file in the Personnel Office an application not more than six (6) months old.

"c. New Employees

Applicants who are not former employees may be employed at the established wage rate determined to be applicable."

Under these provisions the plaintiff was not guaranteed any right to re-employment, but at most was entitled to be considered for employment prior to any applicants who were not former employees of the defendant. Here again, the record shows quite clearly that the plaintiff, along with others in a similar posture and with comparable periods of past service, was considered for re-employ-ment in compliance with the established practice and policy provisions. As heretofore stated, the plaintiff's application was considered by the plant Personnel Supervisor and the Medical Superintendent and they concluded that he did not have the physical capabilities for the labor openings in the Urea Division. This finding was reviewed by the Committee and was also reviewed by members of the staff of defendant's general management in Wilmington. After giving the plaintiff's application such consideration, it was concluded that he was not qualified for re-employment. There is nothing in the record to indicate any fraudulent or arbitrary action on the part of the defendant or those members of its staff who had occasion to consider plaintiff's application, and the adverse medical history of the plaintiff as disclosed by defendant's records would appear to support the conclusion which was reached.

However, in any event, the issue in such a case is not whether defendant's management reached a correct or incorrect conclusion. The only issue is whether plaintiff's application for re-employment was fairly considered by the defendant. The issue presented here is analogous to those contracts which provide for employment as long as the employee's services are satisfactory to the employer. In such cases the employer is the sole judge of what constitutes satisfactory service just as in the present case the defendant's management team was properly the sole judge of whether or not plaintiff met the criteria for re-employment. See Tow v. Miners Memorial Hospital Association, Inc., 199 F.Supp. 926 (S.D.W.Va.1961). In his opinion in that case, the late Judge Harry E. Watkins thoroughly reviewed the appropriate West Virginia law in this area and concluded that summary disposition was appropriate. In affirming Judge Watkin's action, the Court of Appeals stated (305 F.2d 73, at 76):

" '[W]here a person contracts to * * * do work to the satisfaction of another, such other is * * *

134

the sole judge of the quality of work done, and his right to accept or reject it is absolute, conclusive, and binding upon the parties, without the investigation of his reasons, unless he acts fraudulently. Barrett v. Raleigh Coal & Coke Co., 51 W.Va. 416, 41 S.E. 220, * * *.' Blue v. Hazel-Atlas Glass Co., 106 W.Va. 642, 147 S.E. 22, 25 (1929). Under the circumstances of this case, 'a jury would not have been authorized to disbelieve the officials who * * * [asserted] a real dissatisfaction and the court did not err in * * * [granting the motion for summary judgment] for the defendant.' Shepherd v. Union Central Life Ins. Co., 74 F.2d 180, 183 (5th Cir. 1934). See 35 Am.Jur. Master and Servant § 28 (1941)."

It is my conclusion that the same principles should apply to the present case, and accordingly defendant's motion for summary judgment will be granted and counsel may prepare an appropriate order incorporating this memorandum opinion by reference therein.