W. H. SNODGRASS *et al.* v. SALLIE C. WEAVER *et al.*

(No. 8761)

Submitted September 7, 1938. Decided September 27, 1938.

*Harper & Baker, R. S. Blair* and *S. P. Bell,* for appellants.

*S. A. Powell, Robert B. McDougle* and *Thomas J. Davis,* for appellees.

RILEY, JUDGE:

This suit was brought by five of the eight children of Matilda Josephine Snodgrass, deceased, against the remaining three, and H. L. Weaver, a brother-in-law, as executor, for the purpose of having a certain paper writing, dated the 9th day of July, 1934, and purporting to be the last will and testament of their mother, declared not to be her true last will and testament, for the reasons of lack of mental capacity and undue influence. A jury, on an issue out of chancery of *devisavit vel non,* found for the proponents. Exceptions were taken to the court's action in overruling a motion to set aside the jury verdict, as well as to the judgment and decree based thereon.

On this appeal, the contestants insist that the verdict should be set aside and a new trial awarded them, because of (1) admission of certain testimony on the part of the subscribing witnesses, and (2) giving of certain instructions.

Matilda Josephine Snodgrass, at the time of her death, August 7, 1934, was eighty-two years of age. Her husband predeceased her, June 22, 1934. The couple during their early married life resided in Roane County, West Virginia. From there they moved to Delta, Pennsylvania, where they had resided for twenty-five years. On July 2, 1934, Mrs. Snodgrass was taken from Delta to the home of Sallie Weaver, a daughter, living near Rutherford, Ritchie County, West Virginia. She was accompanied on this trip by three of her daughters, i. e., Mrs. Weaver, Mrs. Parks and Mrs. Chewning, the latter two of Parkersburg, and a grandson, Jerome Weaver, all of whom seemed to have remained in Delta after the burial of Mr. Snodgrass, and Dr. Snodgrass, a son, who, at the time, lived in Delta, Pennsylvania. A few days

thereafter Jerome Weaver drove to Delta in a truck and removed a portion of his grandmother's household effects to Rutherford. The paper writing in question was executed by the decedent on July 9, 1934, one week after her arrival at the Weaver home. Shortly thereafter, she was taken on at least two visits of three and two days' duration, respectively, to Parkersburg. A brother-in-law, from Maryland, testified that while he was visiting in the Weaver home, around July 12th, Mrs. Snodgrass "remarked that she was there penniless and didn't have anything." Also "she said some of them thought it might be best for me to come down here awhile, and she said she would stay awhile anyway." A next-door neighbor testified that Mrs. Snodgrass, upon leaving for West Virginia, told him that she would be seeing them before long.

There is evidence in the record to the effect that decedent, at the time of her husband's death, was in poor health and did not realize that her husband was dead. Dr. Wilkinson, formerly of Pennsylvania, now of Maryland, testified that he had treated decedent and had personal knowledge of her mental capacity prior to, up to, and immediately after her husband's death. He was of the opinion that she was incapable of making a will. In fact, he said that her mentality was that of a two or three-year-old child. In addition to other witnesses, this testimony is corroborated by a Miss Jones, a trained nurse who had nursed Mrs. Snodgrass during a severe illness in 1930, and last saw her on June 28, 1934. On the other hand, a Dr. Parks, of Parkersburg, the husband of one of decedent's daughters, testified, against his wife's interest, that he had known decedent for thirty-two years, had visited her in her home in Pennsylvania on several occasions, had entertained her as a guest in his own home in Parkersburg, generally every year during the time decedent was living in Pennsylvania, and had seen her in Ritchie County during the last few weeks before her death, the last time being on July 28, 1934. He vouched his professional opinion

that she was a person of sound mind and capable of making a will. Likewise, Dr. Parks' mother, an aged witness, who had cherished a lifetime friendship with decedent, gave clear testimony of her soundness of mind. Both the attesting witnesses, Dewey Wass, the attorney who wrote the will, and Ruth Godley, his stenographer, testified to the effect that testatrix had sufficient mental capacity to make a will.

The evidence discloses that Mr. Weaver, the husband of the principal beneficiary, and the executor named in the paper writing, went to Mr. Wass' office in Harrisville and requested him to prepare a will for Mrs. Snodgrass. There, following Mr. Weaver's directions, the attorney dictated the paper to his stenographer, Mrs. Godley, who transcribed the dictation on the typewriter after Weaver's departure. On the afternoon of the same day, Mr. Wass and Mrs. Godley went to the Weaver home and there, in the presence of Mr. and Mrs. Weaver, the entire paper was read at least twice to Mrs. Snodgrass. Under its terms, Mrs. Snodgrass' entire estate (appraised at $7,532.25), with the exception of fifty-dollar bequests to each of the remaining children, went to Mrs. Weaver. This fifty-dollar bequest paragraph was suggested to the scrivener by Mr. Weaver without any direction from Mrs. Snodgrass. The latter did not at first grasp its meaning. But, according to Mr. Wass, after it had been explained to her that, in the event her personal estate would be insufficient to pay said bequests, they would, under the provisions of the paragraph, be reduced accordingly, she agreed to the provision. And then signed the paper.

So far as the record discloses the Weavers and the subscribing witnesses were the only parties who knew of the execution of the will prior to Mrs. Snodgrass' death.

It would be unprofitable to review in detail the testimony of the many witnesses. A careful reading of the record, however, reveals a clear conflict of evidence on the question of mental capacity. In truth and in fact,

from parts of the evidence, we could glean that the decedent had the mentality of a child of tender years, and other parts of the record would indicate she had been a woman of sound mind and strong intelligence. We are impressed that the issue of mental capacity was properly one for the jury to solve.

The appellants insist that it was error for the trial court to permit the attorney, Dewey Wass, to testify as an expert upon his professional skill and experience as an attorney and the stenographer, Ruth Godley, to testify as an expert upon her experience in law offices in writing and witnessing wills, as to the mental capacity of the decedent to make a will. They were asked and answered in the affirmative the following questions:

"Q. Mr. Wass, basing your answer upon your conversation with the testatrix on the occasion of the execution of this paper, and upon your professional skill as an attorney, and your previous experience in the law office of Judge Prunty and myself, with reference to the preparing and execution of wills, state, if at the time this paper was signed, the testatrix had sufficient mental capacity to make a will."

"Q. You may state, Ruth, from your previous experience in the law-offices of H. R. Taylor and Dewey S. Wass, prosecuting attorney of this county, in writing wills and witnessing them, and the age of people, what you saw and observed, on that occasion, whether Mrs. Snodgrass at the time she signed that will, had sufficient mental capacity to do so."

The attorney and his stenographer, having been present and observed the testatrix at the time of the execution of the will, were entitled to express their opinion, as non-experts, of her mental capacity at that time regardless of the fact that they were attesting witnesses. 1 Page on Wills (2d Ed.), 1161; sec. 696. But the court, by permitting counsel to propound the foregoing questions and elicit answers thereto, stepped them into the category of experts, which they were not. This of itself

was prejudicial error which was intensified by the giving of Instruction No. 10. The jury were told in proponents' Instruction No. 9, and properly so, that the testimony of credible witnesses present at the execution of the will, and especially attesting witnesses, is entitled to peculiar weight on the question of testamentary capacity. *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Kerr* v. *Lunsford*, 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668. Instruction No. 10, however, unduly emphasized the importance of their testimony. It told the jury "that the evidence of the witnesses who testify from their personal knowledge, being at the same time possessed of professional knowledge, learning, skill, and experience which enables them to better understand the matters to which they testify than persons not possessed of such superior advantages, is entitled to more weight than the testimony of witnesses not so possessed." This instruction is good in so far as it applies to the testimony of the two doctors who testified respectively for the proponents and contestants in this case. A professional witness, skilled in the matters concerning which he is called upon to testify, having personal knowledge of the facts upon which his testimony is predicated, may give his expert opinion in testimony. 3 Jones, Commentaries on Ev. (2d Ed.), sec. 1333; *Ward* v. *Brown*, 53 W. Va. 227, 44 S. E. 488. But, because the instruction was broad enough to extend to the testimony of Mr. Wass and Mrs. Godley, it is bad. We cannot say it did not influence the jury in its verdict, and therefore, the error is prejudicial.

Objection is made to the giving of proponents' instruction No. 7 because (1) it is abstract, and (2) it instructs the jury that it requires "less mental capacity to make a will than it does to make a deed." An abstract instruction, of course, should not be given. To do so contravenes the better practice, but unless confusing or misleading, the giving of abstract instructions is not reversible error. *Weese* v. *Rosencrance*, 116 W. Va. 569, 182 S. E. 570; *Jones* v. *Smithson*, 119 W. Va. 389, 193 S. E. 802; *Koiner* v. *Rankin's Heirs*, 11 Gratt.

420, 429. The vice in the instruction is that it tells the jury that it takes less mental capacity to make a will than a deed. This, undoubtedly, is a true statement of the law. Time and again, this Court has so held. *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668; *Buckey* v. *Buckey,* 38 W. Va. 168, 18 S. E. 383; *Stewart* v. *Lyons,* 54 W. Va. 665, 47 S. E. 442. The fault lies not in the law of the instruction; it resides in the state of the record wherein, and perhaps properly so, no standard is established as to how much capacity is required to make a deed.

A number of instructions, offered by both the proponents and contestants, on the issue of undue influence, were read to the jury. Exception was taken to the giving of the proponents' No. 13, which told the jury that "the undue influence necessary to vitiate and nullify a will must be such as to amount to force and coercion destroying free agency and there must be proof that the will was obtained by this coercion; also in order to set aside the will of a person of sound mind, it must be shown that the circumstances of its execution are inconsistent with any other hypothesis or theory, but that of undue influence which cannot be presumed, but must be shown in connection with the will and not with other things." This instruction is abstract. In its abstraction, it is predicated upon the assumption that the decedent was a person of sound mind. Of course, if decedent was mentally incompetent to make a will, that would control the case, and the question of undue influence would be immaterial. The real objection to the instruction lies in the fact that, by suggestion at least, the jury may have been misled from the possible inference that the decedent, though of a sound mind, may have been a person of weak intellect due to the infirmities of her advanced age, and therefore easily susceptible to undue influence. To that extent, the instruction is inapplicable to the facts of the case and misleading. An additional objection is made on the ground that the instruction defines the undue influence necessary to vitiate and nullify a will as such as

to amount to *force and coercion*. This language is clearly misleading. True, like language has been used by this Court. *Payne* v. *Payne*, 97 W. Va. 627, 125 S. E. 818; *Stewart* v. *Lyons, supra*. The words "force" and "coercion" appearing in the syllabus of the last named case should be construed to include moral force and coercion in addition to physical force and coercion. Their use in the instruction is prejudicial, because the jury was very apt to give the words their ordinary meaning, that is, that physical force and coercion are necessary to constitute undue influence. Our views in this regard to this instruction are well expressed in the following excerpt from *Chappell* v. *Trent*, 90 Va. 849, 929, 19 S. E. 314, 342.

> "The word *coerce*, to the ordinary mind not trained to nice distinctions, naturally carries with it the idea of physical force or threats of personal violence. Now, in the present case, it is not pretended that any physical force was applied, or any threats of violence resorted to. Then how natural it was for the jury, when told that 'influence to vitiate an act must amount to force and coercion,' that inasmuch as there was in this case no application of actual physical force, and no threats of personal violence, therefore the will in question is the spontaneous offspring of a sound and disposing mind and memory, and is, therefore, the true last will of the alleged testator."

The appellants' brief points out no other error which we deem prejudicial.

For the reasons stated, we are of opinion the trial court erred. The judgment and the decree of the circuit court are therefore reversed and annulled, the verdict of the jury set aside, and the cause remanded for a new trial.

*Judgment and decree reversed; verdict set aside; new trial awarded.*