THE BOARD OF COMMISSIONERS OF THE COUNTY OF OHIO *v.* ELM GROVE MINING COMPANY

(No. 9002)

Submitted May 7, 1940. Decided June 22, 1940.

*Schmidt, Hugus & Laas,* for appellant.

*C. Lee Spillers* and *John D. Phillips,* for appellee.

*Chas. E. Mahan, Jr.,* amicus curiae for Koppers Coal Co., New River & Pocahontas Consolidated Coal Co., and New River Co.

*Robert G. Kelly* and *Frank R. Lyon, Jr., (Brown, Jackson & Knight,* of counsel) amicus curiae for West Virginia Coal Association.

MAXWELL, JUDGE:

This is a suit to enjoin a public nuisance. From a decree granting the prayer of the bill, the defendant was awarded this appeal.

The suit is based upon this statute:

"The state commissioner of health or any county or municipal health officer shall inquire into and investigate all nuisances affecting the public health within his jurisdiction; and any such officer or the county court of any county or any municipality is authorized and empowered to apply to the circuit court of the county in which any such nuisance exists, or to the judge thereof in vacation, for an injunction forthwith to restrain, prevent or abate such nuisance." Code, 16-3-6.

The plaintiff is the Board of Commissioners of the County of Ohio, a public corporation. The defendant is Elm Grove Mining Company, a private corporation. The plaintiff is the officiary which fulfills for Ohio County the duties which are generally discharged by county courts. This arrangement for Ohio County, established by legislative enactment in pursuance of Section 34, Article VIII of the West Virginia Constitution of 1872, has been preserved

under authorization of Section 24 of Article VIII as amended in 1879. Since the plaintiff is empowered to act in lieu of a county court, it clearly comes within the provisions of the above quoted statute which authorizes county courts to proceed for the abatement of nuisances affecting the public health.

The defendant is a mining company engaged in the production and marketing of bituminous coal. Number 3 mine of the defendant is situated near the National Pike (U. S. Route No. 40) about one and one-quarter miles east of the town of Triadelphia which is a community of approximately three hundred population. Triadelphia lies between the mine and Elm Grove which is within the eastern boundary of the City of Wheeling. The distance from Triadelphia to Elm Grove is about two miles.

The alleged nuisance is a burning pile of gob or refuse materials from defendant's mine number 3, which pile has been created by the defendant in the course of its operations at that mine. The basis of the complaint is that in the vapors emanating from this burning material there is sulphur dioxide in quantity deleterious to the health of the people of that community.

The alleged harmfulness of the gob pile fumes is denied by the defendant.

For each party to the controversy much testimony was taken. The record is large.

The town of Triadelphia is an old community. It came into existence many decades before the defendant opened and began to operate mine number 3 about the year 1915. Incident to this operation, and from the beginning, defendant cast aside on its own property refuse from the mine. Accumulation of these materials through the years has resulted in a gob pile approximately two hundred feet wide and a thousand feet long, with a variant height from thirty to sixty feet. This pile of material caught fire in 1930 and since that time has been burning continuously in a smothered activity. Though it is testified by men experienced in the mining of bituminous coal that large gob piles will take fire from spontaneous combustion, the evi-

dence seems to establish that this fire was caused by incendiarism. For the defendant it is testified that extended and repeated efforts, though futile, have been made by it to extinguish the smoldering embers.

For the plaintiff more than a score of lay witnesses, residents of the community, testified respecting the harmful effects of these fumes on the witnesses themselves or members of their families. The substance of this testimony is that through much of the time, within a radius of somewhat more than a mile of the gob pile, the atmosphere is pungent with the odor of burning sulphur; that this condition varies with the humidity, wind currents and the activity of the gob pile fire; that many times, regardless of warmth of weather, it is necessary for them to keep the doors and windows of their homes tightly closed in defense against the fumes; that the gases given off create a burning sensation to the nose, throat, eyes and respiratory tract with resultant irritation thereto, causing headache, coughing, loss of appetite and sleeplessness. Illustrative of the situation, we note particularly the testimony of two witnesses. One of them, now residing with her husband and baby elsewhere than the neighborhood of mine number 3, testified that for a period of seven months they lived in a home within two or three hundred feet of the burning gob pile; that when they moved into that home the child, then eleven months old, was of normal health; that while there the child suffered much from soreness of throat and impaired appetite, resulting in loss of weight; that when the baby was taken away from that community it promptly regained normal condition. Another witness, an elderly man, testified that the fumes affected his throat, particularly his vocal cords; that he has noticed that when he is away from the community for a few weeks, the irritation in his throat subsided.

There was also the testimony of several physicians called by the plaintiff:

Dr. R. M. Pedicord, who lives at Elm Grove and for twenty-five years has been a practitioner in that community, and who at the time of giving his testimony was

Health Commissioner of both the City of Wheeling and the County of Ohio, testified that in passing along the highway near the gob pile he has experienced irritation of his nose and throat; that the fumes inflame the mucous membrane of one's nose and throat and bronchial tubes, also that they affect the eyes and lungs; that such disturbance of the throat leads sometimes to acute bronchitis "which predisposes to more serious disturbances" such as pneumonia and tuberculosis; that he has patients at Triadelphia who are suffering from physical disorders attributable to the deleterious fumes emanating from the burning gob pile; that in his opinion the fumes are a menace to health.

Dr. A. V. McCoy, a resident of Triadelphia, testified that he has practiced medicine in that community for eleven years; that patients of his have suffered from irritation of the throat and nose and from shortness of breath caused by the gob pile fumes, especially on damp days; that among his patients, irritations and lesions of the nose and throat abated when the fire in the gob dump subsided from the application thereto of water by the defendant; that in his opinion the fumes are injurious to the public health.

Dr. Burke Megahan testified that he has been practicing in the Elm Grove and Triadelphia communities for eight years; that he has patients in that vicinity suffering from bronchial irritations which he attributes to the fumes from the gob; that he can detect the fumes in the atmosphere whenever he passes that way, especially if the air is heavy; that in his opinion the fumes are harmful to everybody in that community.

Dr. J. R. McClung, who resides in a residential section of the City of Wheeling and has been a practicing physician for about twelve years, testified respecting the harmful effects of sulphur dioxide and expressed the opinion that where samples of air disclose presence of sulphur dioxide in amounts varying from 6.1 to 17.4 parts per million an unwholesome atmospheric condition exists; that he suffers from sinus trouble and that when he is in the near region of the gob pile at defendant's number 3 mine he quickly notices an accentuation of his ailment.

Dr. H. C. Harpfer, who lives in the City of Wheeling and practices there, testified respecting the pernicious effects of sulphur dioxide in the atmosphere; that he and his wife occasionally visit his wife's parents, Mr. and Mrs. Arthur S. Evans, whose home is about five hundred feet in a direct line from the lower end of the gob pile; that on such occasions he and his wife both noticed irritation caused by the fumes from the burning gob.

Dr. Robert J. Reed, a practitioner of medicine and surgery in the City of Wheeling, residing at Highland Park, which is within the locality reached by fumes from the burning gob pile, testified that the presence of sulphur fumes in the atmosphere has been noted by his family and himself. Further, that his "entire family have felt the irritating effects on the nose and throat." Conceding that where he resides the objectionable fumes are not of sufficient concentration to "cause anything of any serious nature" beyond irritation of the respiratory tract, he stated, in response to a hypothetical question pertaining to the presence of sulphur dioxide in the proportion of 17 parts per million of atmosphere, that, in his opinion, such condition of the air "would be very irritating"; that continual irritation "could probably lead to very serious results."

C. J. Potter, a chemical engineer, was employed by the plaintiff to make atmospheric tests in the vicinity of the burning gob pile. Several tests were made by him in February, March, and August, 1934. He examined samples of air taken at different points in the neighborhood. The lowest result disclosed in these tests was 6.1 parts of sulphur dioxide to a million parts of atmosphere and the highest was 17.4 parts of sulphur dioxide. Other samples examined by him disclosed around ten, eleven, thirteen and sixteen parts per million.

The foregoing summary of evidence sets forth the gist of the plaintiff's proof.

A chemical engineer, J. H. Holden, employed by the defendant for the purpose, made numerous atmospheric tests in the immediate and general surroundings of the burning gob pile. These tests, far more numerous than those made

for the plaintiff, disclosed a much lower percentage of sulphur dioxide than was reported by the chemical engineer for the plaintiff. The highest sulphur dioxide saturation Holden found in the region of the gob pile was 4.3 parts per million.

Respecting the wide variance between the results ascertained by the two chemical engineers, the learned trial chancellor made this pertinent observation:

"There was much technical examination and cross examination of these witnesses in an effort to show that the tests of Holden were more accurate than were those of Potter. It is doubtful if a lay Court could reach a reasonable conclusion on this subject so as to justify it in discarding one test in favor of the other. In fact, when the whole matter can be answered so much more logically on the assumption that the air was more polluted at one time than at the other time, it hardly seems necessary to speculate on the reliability of the respective tests. Had these tests been made at the same time we should have a different matter to consider. But this is not a complete statement of the reason why the assumption suggested seems the more probable reason for the difference. It is conclusively proved by the testimony of the several lay witnesses that the atmospheric conditions existing as a result of this gob fire differed from time to time. Many different circumstances contributed to this variance. The fire burned more brightly at some times than at others—this according to the length of time it had been allowed to go and according to the material on which it happened then to be feeding. General atmospheric conditions seem to have made a difference which can be described only as tremendous."

Numerous of defendant's employees, living not far from the burning gob pile, testified that neither they nor their families had experienced any baneful effects from the fumes. Several whose duties have exposed them through working hours to the fumes stated that they had experienced no bad results therefrom.

Four physicians were called to the witness stand by the defendant and testified as here outlined:

Dr. E. S. Bippus:   That he has been practicing medicine at Wheeling and in its vicinity since 1907; that at the time of giving his testimony he was physician for the defendant's employees at its mine number 3; that he has not observed among his patients there any higher percentage of throat and nose ailments than in other parts of the city; that the climatic conditions of the entire Wheeling area are not good.

Dr. J. D. Bird:   That he is a physician located at Elm Grove and is associated with Dr. Bippus in rendering professional service to the defendant's employees; that among the employees he has not observed respiratory irritations occurring more frequently than among other people in the larger area.

Dr. M. J. Hannigan:   That he is a practitioner located at Donora, Pennsylvania; that he is the regularly employed physician for the employees of the Valley Camp Coal Company at its Soudan mine where there is a burning gob pile; that he has not observed sickness among the employees or their families attributable to fumes from that fire.

Dr. C. P. McCord:   That he resides at Cincinnati, Ohio, and in the practice of his profession specializes in industrial technology; that for the past fifteen years his chief activity has been related to occupational diseases, industrial health problems, and the study of poisons in connection therewith; that sulphur dioxide is an irritant, but when diffused in small quantities in the atmosphere is not harmful to normal persons; that "the threshold of toxicity of sulphur dioxide begins somewhere near ten parts of this gas per million of air"; that "it might be a little less for some people, as much as eight parts, and for others it might be a little bit more, that is, the threshold might be twelve to fifteen parts for some persons"; that he visited the defendant's mine number 3 and observed conditions there, and is of opinion that the many railroad locomotives burning bituminous coal, passing by the mine daily, and exposed sewage, may contribute to the sulphur dioxide in the atmosphere of that immediate community.

In appraisal of the whole testimony, the trial chancellor further stated in his written opinion:

"A court can safely hold that anything above eight parts per million constitutes a menace (the reference being to the parts of sulphur dioxide to a million parts of atmosphere).* * *

"We have testimony as to how many parts per million it takes to cause irritation and the various complaints to which the several lay witnesses testified and which plaintiff's physicians testified to treating. · It must follow that at·the time the fumes produced these conditions the atmosphere was permeated to the extent of somewhat more than eight parts to the million. * * * When the chemists and physicians testify that a certain percentage of pollution in the air will produce certain conditions, and when this is coupled by the testimony· of lay witnesses and physicians to the effect that these conditions did exist, that they existed only in the vicinity of the gob pile and in such places as the odors from the same could be detected, the Court must conclude that these afflictions were due to the gases from the gob pile.  It is true that many other witnesses testified that they were not affected by these health conditions, but this is well explained by the general statements of the experts to the effect that some persons are affected by these gases when others are not—referring, of course, to an atmospheric condition when the gas is within the unhealthful limit but not very highly so."

While in no manner disparaging the evidence of the defendant as above synopsized, we are of opinion that the trial chancellor, for the reasons given by him, was clearly warranted by affirmative evidence in finding that the fumes from the burning gob pile constitute a nuisance affecting the public health, within the meaning of the statute (Code, 16-3-6) on which this suit is grounded.  Even if we entertained doubt of the correctness of the chancellor's finding, we could not justly disturb it unless we found that it was unwarranted under any justifiable view of the evidence.  "In equity the findings of fact of the trial chancellor will not be disturbed on appeal unless at variance

with undisputed evidence or contrary to the plain preponderance of the whole evidence." *Hatten* v. *Hatten,* 110 W. Va. 208, 157 S. E. 582.

There remains for discussion the question of the effect of an affirmance of the injunctive decree before us upon the coal mining industry of this state. In brief of *amici curiae,* representing the West Virginia Coal Association, it is asserted: "To affirm the decree in this instance is to decree from existence the mining of coal in this State." We do not share that alarm, nor can there properly be attributed to an affirmance herein the sweeping effect which the quoted statement of able counsel indicates. This case is the outgrowth of its own facts and circumstances, and must be evaluated from that viewpoint. A burning gob pile at another mine, and under different surroundings, may not constitute a public health menace. Again we quote from the chancellor's opinion: "This defendant * * * is unfortunately situated both as regards sulphuric content of the material dumped and as regards its geographic situation in the valley * * *."

From throughout the state there were called to the witness stand by the defendant many men experienced in the mining of bituminous coal. They testified that it is necessary to make disposition on the outside of a mine of refuse materials for which there is not space for storing on the inside, except at the cost of impairment of ventilation and safety. That which is thus true of mines generally is true of defendant's number 3. The trial chancellor recognized that fact and so does this Court. But public health comes first. Even in as useful and important industry as the mining of coal, an incidental consequence, such as here involved, cannot be justified or permitted unqualifiedly, if the health of the public is impaired thereby.

Notwithstanding a business be conducted in the regular manner, yet if in the operation thereof, it is shown by facts and circumstances to constitute a nuisance affecting public health "no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law." 1 Wood on Nuisances (3rd Ed.), sec. 19. Consult:

*Board of Health of Lyndhurst* v. *United Cork Companies,* 116 N. J. Eq. 4, 172 Atl. 347; *Washington Cleaners & Dyers* v. *Albrecht,* 157 Md. 389, 146 Atl. 233; *State* v. *Service Cushion Tube Co.,* 316 Mo. 640, 291 S. W. 106.

"The 'comparative injury' doctrine should be applied with great caution" in nuisance cases, even though not involving public health. *Ritz* v. *Woman's Club,* 114 W. Va. 675, 173 S. E. 564, 182 S. E. 92. With all the more reason there is extremely narrow basis for undertaking to balance conveniences where people's health is involved.

Though gob piles are necessary incidents of coal mining the record seems clear that there may be substantial variation in manner in which, and the inflammability of the materials wherewith, these refuse dumps are created. Not all of the solid substances discarded from a mine are combustible. Naturally, the likelihood of fire, whether from outside cause or from spontaneous combustion, varies in proportion to the quantity of the easily-to-be-ignited materials cast on a gob pile. The evidence establishes that some of the more highly combustible of unmarketable substances may be used for fuel in connection with the operation of the mine, and that, of wholly discarded substances those which will more readily ignite can be piled separately from those which burn less readily. Opportunity is thus afforded for reducing the hazard to public health on account of large gob pile fires.

That the chancellor's decree in restricting the further casting of refuse on the burning gob pile at defendant's number 3 mine is not likely to result in destructive hardship on the defendant because of supposed unavailable space for piling refuse, appears from the testimony of defendant's manager. Counsel for the defendant asked him this question: "Do you know of any other ground which you can use out there for that sort of gob, other than the ground on which that gob pile is now located?" The witness answered: "No. There are several acres that we own on the other side of the road, but they are all occupied by buildings or where we are holding those in reserve for other uses." The negative answer of the witness is thus

qualified by his own language whereof the necessary import is that at least some of the area across the road is not occupied by buildings. The defendant's superintendent, on cross-examination, stated that the company has "around fifteen or twenty acres" of level land "right along side of the road across from the mine entrance." In accentuation of the fact that the defendant has not been subjected to undue hardship by this proceeding, it is noted that operations at mine number 3 have continued unabated, though since the date of a preliminary injunction, March 13, 1933, the defendant has been restrained from dumping materials on the burning gob pile, and, according to the testimony of an outside boss, the refuse has, in fact, been dumped elsewhere.

Some of the refuse material which is being taken from defendant's mine number 3 is non-combustible. We perceive no controlling reason why that material should not be cast on the burning gob pile if defendant so elects, since the fire cannot be augmented thereby. Therefore, the paragraph of the chancellor's decree which inhibits "dumping or depositing refuse matters" on the burning gob pile while the fire continues, will be modified to read:

"That the defendant herein, the Elm Grove Mining Company, a corporation, its officers, agents, employees, and all others associated with it be, and they are hereby forever restrained from dumping or depositing *any combustible* refuse matters taken from said mine number 3, into or upon the said 'gob dump' so long as the same remains afire and, thereafter, *materials may be dumped there* in such manner only as shall not, under reasonable conditions, cause the same to catch afire."

The chancellor's final decree, dated December 30, 1938, as modified in this sole particular, is affirmed.

*Modified and affirmed.*

KENNA, JUDGE, concurring:

Judge Kenna would affirm the trial chancellor's decree but would not alter the phraseology of the order.