W. F. MULLENS *et al. v.* H. E. LILLY *et al.*

(No. 9119)

Submitted February 18, 1941. Decided March 15, 1941.

*File, Scherer & File* and *Bailey & Shannon,* for appellants.

*Sanders & Day, Walter G. Burton* and *William M. Holroyd,* for appellees.

RILEY, JUDGE:

This suit in equity was instituted in the Circuit Court of Wyoming County by W. F. Mullens and others, heirs-

at-law of A. J. Mullens, deceased, and Hattie Mullens, his widow, against Nora Lilly, also an heir-at-law, and H. E. Lilly, her husband, Estil A. Lilly, and D. Forrest Lilly, their sons, Estil A. Lilly, executor of the last will and testament of A. J. Mullens, deceased, M. H. Lusk, Trustee, and Peoples Bank of Mullens, for the dual purpose of (1) cancelling and annulling certain deeds on the ground that they were procured from the grantor, A. J. Mullens, without consideration, by fraud and undue influence at a time when he was physically infirm and mentally incapable of understanding the nature and effect of said deeds; and (2) setting aside the purported last will and testament of decedent, executed on May 3, 1937, and probated in the County Court Clerk's office of Wyoming County. This appeal is prosecuted from a final decree setting aside the deeds, making reference to a commissioner for determination of certain adjustments between the defendants and the estate of A. J. Mullens, and decreeing judgment against the defendant, H. E. Lilly, in favor of the Mullens estate in the amount of $2,088.46, with interest.

The proper names "Mullens" and "Mullins" are interchangeably used in the record to describe the decedent and litigants. We shall follow the original and amended bills and the final decree and use the spelling "Mullens."

Plaintiffs being required by the Court to elect between the contest of the will and the attack on the deeds, proceeded with that part of the case having to do with the cancellation and annulment of the deeds, the bill being dismissed as to the other relief sought.

The court, after consideration of supporting and opposing affidavits, directed an issue out of chancery, on plaintiffs' motion on the questions: (1) Whether the deeds sought to be set aside, or any of them, were obtained from A. J. Mullens by means of fraud or undue influence; and (2) whether at the several times these deeds were executed, A. J. Mullens by reason of his mental condition was incapable of clearly understanding and appreciating the nature and effect of said deeds.

Trial of the issue having been had, the jury returned the verdict thereon: "We, the jury, find and agree to a

verdict in favor of plaintiff." The court refused to accept this verdict and on plaintiffs' motion submitted to the jury the following interrogatories: "First: Whether the deeds involved in this case, or any of them were obtained from A. J. Mullens by means of fraud or undue influence, and if you find any of the deeds were obtained by fraud or undue influence, which of the deeds were so obtained by such means"; and "Second: Whether on the dates of the execution of said deeds, A. J. Mullens was mentally capable of clearly understanding and appreciating the nature and effect of said deeds, and if you find that A. J. Mullens was not mentally capable of clearly understanding the nature and effect of any such deeds, which of such deeds were executed while he was mentally incapable of clearly understanding the nature and effect of such deeds." The jury found: "We, the jury, find that all *twelve* deeds in question were obtained by fraud or undue influence." (Italics supplied.) Though the jury did not retire from the court room to consider further its finding on the first interrogatory, plaintiffs' counsel submitted a proposed amended verdict, which was signed by the foreman in open court, to the effect that the eleven deeds under attack on the issue out of chancery were obtained from A. J. Mullens, deceased, by means of undue influence. The decree complained of approved the jury verdict, set aside separately the deeds on the grounds of both undue influence and lack of mental capacity, decreed judgment in favor of decedent's estate against defendant, H. E. Lilly, in the amount of $2,088.46, and referred the cause to a commissioner to determine taxes paid and improvements made by defendants.

The record is voluminous. It is composed of nearly thirteen hundred printed pages, embraces the testimony of many witnesses and embodies numerous pleadings, decrees, affidavits and exhibits. It would not be useful to detail the many facts and circumstances portrayed by this record.

Decedent died on February 26, 1938, at the age of eighty-one, survived by Howard Mullens, Van B. Mullens, W. F. Mullens, Susie Mullens Workman, Mary Mullens Phillips,

Nora Lilly, and Eliza Mullens Nichols, children of A. J. Mullens, George Arnold Cook, Annie Cook Campbell and Ethel Dillon, children of a deceased daughter, Hannah Mullens Cook, Hattie Mullens and R. R. Mullens, children of another deceased daughter, Martha Mullens, and Harriet Mullens, his widow, all of whom are plaintiffs herein, except the defendant, Nora Lilly. The defendant H. E. Lilly is the husband of Nora Lilly, and the defendants Estil A. Lilly and D. Forrest Lilly are their children.

Between September 2, 1933, and August 1, 1936, A. J. Mullens made the following deeds, in several of which Harriet Mullens, his wife, joined: (1) Three deeds to Nora Lilly, dated September 2, 1933, February 20, 1935, and October 14, 1935; (2) three deeds to H. E. Lilly, dated March 14, 1935, January 17, 1935, and May 11, 1936; (3) four deeds to Estil Lilly, dated October 27, 1934, February 23, 1935, July 29, 1935, and August 1, 1936; and (4) one deed to D. Forrest Lilly, dated March 5, 1935. These are the conveyances set aside by the trial court.

A. J. Mullens was a respected and outstanding citizen of the community in which he lived. He was the founder of the Town of Mullens, and through its development, which began with the building of the Virginian Railway Company's tracks through his farm, accumulated considerable property. Evidently he was kind and generous to his family. Besides the property which he conveyed to the Lillys, he made a number of conveyances of valuable property to his other children and grandchildren, extending over a period of many years. He took a wide interest in civic, religious and business affairs. He had been a justice of the peace, a member of the West Virginia Legislature, one of the founders, vice president and a director of the Peoples Bank of Mullens, an extensive dealer in real property, the operator of a grist mill, and a minister and benefactor of the Primitive Baptist Church, of which during a long lifetime he had been a constant and faithful member.

The trial court having decreed the invalidity of the deeds under both the issue of undue influence and mental capacity, it is necessary for us to discuss the parts of the

record bearing on both issues. Though it is difficult to conceive of undue influence being used on a person to compel an act of which he is mentally incapable of performing, it is a matter of common experience, as shown by the decided cases, that less influence is required to compel an act by a person of retarded or diminished intellect than in the case of one of strong intellect. *Ebert* v. *Ebert,* 120 W. Va. 722, 200 S. E. 831; *Freeman* v. *Freeman,* 71 W. Va. 303, 76 S. E. 657; *Black* v. *Post,* 67 W. Va. 253, 67 S. E. 1072; *Coffman* v. *Hedrick,* 32 W. Va. 119, 9 S. E. 65. With this general view in mind, let us first review the evidence bearing upon decedent's mental capacity.

In the first place the fact that decedent made the conveyances in question, though some were made without consideration and others upon a claimed inadequate consideration, is by no means decisive of his lack of mental capacity.

We are mindful that he was an old man at the time these conveyances were made, but he was of fine character and generous disposition toward his church and the members of his family. He was a great patriarch in every sense of the word, and his many conveyances to his children and grandchildren, including those to the Lillys, have of themselves no strong evidentiary value as showing decedent's lack of mental capacity. These conveyances, in the absence of undue influence and lack of sufficient mental capacity, simply indicate his generous spirit and love for family.

Plaintiffs' counsel say that because the decedent made a will on March 3, 1937, whereby, after making bequests of one dollar each to two sons and two granddaughters, he devised and bequeathed the residue of his estate in seven equal parts to certain named children and grandchildren, at a time when he had already disposed of most of his property, is evidence that he did not, in fact, know what property he had. Reliance is had upon the fact that on February 26, 1938, at the time of his death, his estate had an appraised value of only $837.89. True, he had relinquished most of his property at the time he made this will. Nevertheless, besides the interest which he re-

tained in some of the property which he had conveyed, he had property available for testimentary disposition: sixty shares of the stock of Peoples Bank of Mullens, with a book value of $150.00 a share, and a total value of $9,000.00; a farm of forty acres which he later conveyed to Roy Phillips, a son of the plaintiff, Mary Phillips, in trust for Paul Phillips and the members of the Phillips family; and a note of the Nicklet Coal Company for $4,255.55, of uncertain value. In addition decedent gave to H. E. Lilly a check for $550.00, dated February 8, 1938, (about the time he went to the hospital) which plaintiffs' counsel infer was used to pay a portion of decedent's medical and hospital expenses. Though there is evidence to the effect that decedent indicated an intention as to the disposal of the bank stock before his death, the fact is that at the time the will was made he actually owned the stock, and if disposition had not been made prior thereto, it would have devolved in accordance with the provisions of his will. Under the circumstances, we think the will of March 3, 1937, does not indicate that at the time of the execution of the deeds in question decedent's mental capacity had diminished in the least. On the contrary, nearing, as he was, the end of his life, it was perfectly natural for him to have provided for the distribution at his death of the property he owned and which was available for testamentary disposition.

The medical evidence in this case bearing on decedent's mental capacity clearly preponderates in defendants' favor. Dr. Walter Dearing, connected with the Wylie Hospital at Mullens, after decedent was admitted as a patient on November 3, 1937, and had remained a week or ten days, made a routine examination and found the patient had prostatic trouble and mild diabetes. From a lengthy conversation with decedent, he formed the opinion that decedent had no impairment of the mind. Dr. Ward Wylie, who operates the Wylie Hospital, first met decedent in 1931 or 1932. He treated him professionally, saw him often in Mullens, had business transactions with him, and from an examination made December 23, 1936, found him mentally alert, without any noticeable indication of

impairment of memory. On the occasion of the examination, Dr. Wylie talked with decedent three-quarters of an hour, during which time he observed him to see if he could detect any weakness of mind, but discovered none. He testified that decedent was unusually alert; that decedent discussed with witness, then a member of the legislature, legislative matters; that he knew how committee assignments were made, and the work of the various committees of the legislature.

Dr. J. F. Biggart, a practicing physician in Mullens since 1922, knew decedent during that time, saw him frequently and treated his family. He testified that on December 23, 1936, he had examined decedent and found that his mind was sound, and believed it had been so from the time of their first acquaintance in 1922 until death.

Dr. J. O. Bailiff, first became acquainted with decedent in 1931, when he began the practice of medicine there. He testified that he was decedent's physician from 1924 or 1925 until his death; that he saw him frequently between 1924 and when decedent became ill in the fall of 1937; that he had treated him from the time he became ill in 1937 until he was taken to Washington in February, 1938; that he never saw anything to indicate that decedent was mentally unsound, except slight flightiness during two or three days while a patient in the Wylie Hospital. He testified emphatically, "Oh, his mind was all right; no question about his mentality."

Dr. Steele, the sole medical witness examined on plaintiffs' behalf, was physician for A. J. Mullens for a number of years and treated him the last time about 1934. He testified that he found decedent had prostatic trouble and high blood pressure, and, without attributing any mental impairment to decedent, gave, over objection, the opinion that one of the complications of diabetes is dementia, a disease characterized by impairment of the will, the memory or the intellect.

In addition to the testimony of the physicians, of the nurses who attended decedent during his last illness, all who were called as witnesses testified that they saw no evidence of mental impairment.

More than forty witnesses called by defendants testified that no change in decedent's mental condition was observed over a long period of years up to the time of his last illness. Plaintiffs' counsel say that "very few, if any, of these witnesses had ever had an important business transaction with A. J. Mullens." However, many persons of sound mental capacity and advanced in years have no important business transactions. Certainly that is not a test of lack of mental capacity to execute a deed. The testimony of the many lay witnesses called by defendants indicates that except for several days of delirium during his last illness and the possible confusion in his mind as to parliamentary procedure on the occasion of the Primitive Baptist Association meeting in 1936, decedent had an alert mind for a person of his age, and was capable of knowing his property, his relations with the members of his family, and the things going on around him within the sphere of his life.

A review of the testimony of defendants' lay witnesses convinces us that they were in position to form opinions as to decedent's mental capacity.

A. L. Brooks knew decedent for more than forty years, came in contact with him frequently from 1932 to 1936, and discussed with him general and local questions. He testified that while working on a flood control wall built around property formerly owned by decedent, he stated that the wall would hold decedent's property, and decedent replied that he did not own the property, having conveyed it to Mr. Lilly. Lize Rose knew decedent thirty-nine years; saw him three or four times a week in the last ten years of his life; discussed with him his garden, fruit trees, and bought chickens from him in 1934, 1935, and 1936. John Frank knew decedent for seventeen years, did plumbing and heating work for him over a period of years up to the fall of 1936, usually on credit, and noticed that decedent was careful about his account. Daniel Dalton knew decedent for eight or nine years, discussed with him gardening and farming, did shoe repair work for him, and had corn ground at decedent's grist mill as late as 1932. Hannah Worley rented from decedent from 1933 until

1938; decedent collected rents and gave receipts properly written in his own handwriting. M. M. Rutherford, a fellow lodge member, who had known decedent since 1907, did carpenter and contracting work for decedent, and "worked out thousands of dollars for him." Harold Witt, life insurance salesman, formerly employed by a local feed store, saw decedent several times a week over a fifteen year period, and witnessed the will of March 3, 1937, at decedent's request. J. B. Matherly, automobile mechanic, first became acquainted with decedent in 1927, worked on decedent's automobile, put a starter generator in the grist mill in 1933 or 1934 under decedent's direction and supervision, and as notary public took the acknowledgments of decedent and wife to several deeds between 1935 and 1937. John Ball, former Sheriff of Wyoming County, to whom decedent had paid taxes from time to time, had known decedent from 1895 until his death, and testified that from conversations had about a year before decedent's death, he found nothing wrong with his mind. M. H. Lusk, cashier of the Peoples Bank of Mullens, of which decedent was a stockholder and director, lived two blocks from him, and saw him frequently over a period of twenty years. He testified that in 1937 decedent discussed the building of a street near his home and stated that he always had been for public improvements of any kind, and on December 20, 1937, when witness delivered checks for dividend and director's fees, he observed no change in decedent, other than failing eyesight and increasing feebleness. W. K. Riner sold groceries to decedent on a charge account from 1931 to 1937. A. C. Early, contractor and builder and president of Peoples Bank of Mullens, saw decedent frequently from 1915 until his death, witnessed the will of March 3, 1937, and had conversations with decedent as late as two weeks before he went to the hospital. E. E. Lampton, manager of Bailey Lumber Company, testified that decedent bought paint and building supplies from him from 1922 until July 1, 1937, including three transactions in 1937, an undetermined number in 1936, ten in 1935, forty-three from 1933 to 1935, and that decedent settled his bill finally on August 9, 1937. All of

these purchases witness stated were made either by Mullens personally or upon his order. W. G. Calloway, feed store operator, sold decedent feed and chickens on a charge account for sixteen years until September, 1937. He testified decedent always paid the bills himself regularly; and talked about the legislature a great deal and about matters of local interest. R. L. Early, contractor and mayor of Mullens, knew decedent for twenty-five years, and had the last conversation with him in October or November, 1937. Amos Tolliver, fellow church member had known decedent about forty years, visited him nearly every Saturday during last illness, and talked with him concerning the ministry, the church and other subjects. A. B. Robertson, funeral director, had known decedent for about twenty-five years and testified concerning a conversation in 1936 or 1937, in which Mullens asked witness to take care of his funeral. D. D. Witt, bookkeeper for Mullens Motor Company, testified that from 1934 until death, he made out rent checks to decedent, who would call for them each month as they became due. S. P. Pearis, yard-master for the Virginian Railway Company, who had known decedent for fifteen years and rented from him until June 9, 1937, testified that during the lease period the latter called for the rent on or about the day due, and apparently understood the business being transacted.

Plaintiffs introduced about twenty witnesses who testified concerning the mental condition of A. J. Mullens, especially during the period from September 1, 1933, until death. Plaintiffs' counsel refer especially to the testimony of E. L. Phillips and Mrs. B. E. Tolliver. Phillips, a lawyer and former justice of the peace, testified he had known decedent intimately since 1926, and noticed a change in him beginning in 1929. He stated his opinion was based largely upon decedent's inactivity; that decedent's memory was bad; that he was untidy in appearance, cooked fish over an electric hot-plate in his office, and scolded young men in the mill for spilling corn. He also testified in particular concerning a misunderstanding over the location of a boundary wall. However, such misunderstandings frequently occur between parties of unquestioned

mental capacity. On cross-examination he admitted that in September, 1929, he had transferred to decedent seventy-two shares of Nicklet Coal Company stock, valued at $7,200.00; that in February, 1933, he had accepted decedent's check for services rendered by him to decedent; that decedent collected rents himself in 1933, realized that he was the owner of property, always realized when he owed anything and when people owed him, and always insisted upon payment and collection. Mrs. Tolliver testified that she knew decedent for forty or forty-five years; that during the last years he became feeble and "unable to do anything in a business way for himself." She stated that he could not take care of his business, but admitted that in 1932 or 1933 decedent tried to sell her the property she was occupying as lessee, and that she would have made the purchase if Mrs. Mullens had been available to sign the deed. The opinions of these witnesses are entitled to little weight in view of the fact that they were themselves willing to enter into important business transactions with decedent.

Most of the testimony as to mental capacity given by plaintiffs' witnesses concerns many trifling matters by no means indicative of the lack of mental capacity to execute the deeds in question. A number of these witnesses based their opinions upon the fact that they saw decedent peddling garden produce from a small basket or red wagon, and that in the last years of his life decedent was untidy in his dress as contrasted to a former neat appearance.

Detailed testimony was given by D. S. Nichols, Jr., Marshall Mullens, James Paul Nichols, Carl Mullens, and Drew Phillips, all grandsons of A. J. Mullens and children of some of the plaintiffs. This latter testimony is to the effect that decedent was careless in his dress to the extent of being slovenly; that he was miserly with reference to food; that he kept a padlock on the "Frigidaire" though generally there was nothing in it except ice water; that he served and ate spoiled meat; that he fed his dogs very little; that he was moody and hostile toward his wife and

children and grandchildren, whereas, at one time he had been gentle and affectionate; that he had the idea that people were imposing on him by eating too much of his food; that he was childish; that his memory was not good; that he often slept in and cooked his meals in his office; that he used ten-watt electric light bulbs; that he would not share with others food on the table which he liked especially; that he liked black-eyed peas and hominy; that most of his time was spent at the grist mill; and that he often slept at the mill. These grandchildren are naturally interested, through their parents, in the outcome of this case. Of course, the credibility of their testimony was for the trial chancellor to determine. This testimony, however, if true only indicates a change in decedent's habits with the passing of years. It is of little importance in the determination of A. J. Mullens' capacity to execute the deeds and to know and appreciate the nature of the transactions in which he was involved.

Several of plaintiffs had transactions with decedent during the time the deeds in question were executed. Though not decisive of the case, they, in our opinion, weaken plaintiffs' position on the question of mental capacity. Prior to 1933, decedent became the owner of one hundred and forty-eight shares of the Nicklet Coal Company stock, for which, as plaintiffs' counsel say, he had paid $6,300.00. On June 10, 1933, he gave to D. S. Nichols, Jr., a son of his daughter, Eliza Mullens Nichols, seventy-three shares of this stock; and on April 15, 1935, he entered into a contract with said grandson, whereby he transferred the other seventy-five shares to him upon the latter's agreement that he would pay decedent $25.00 a month so long as he should live. D. S. Nichols, Jr., later transferred the stock to his mother. On October 23, 1936, A. J. Mullens conveyed a two-acre tract of land in Kanawha County to plaintiff, Eliza Mullens Nichols, which she later sold for $3,250.00. Decedent also endorsed notes for D. S. Nichols, Sr., for several years immediately preceding his death, the last of which was within sixty days prior thereto. Though D. S. Nichols, Sr., testified that the coal company stock was secured from Mullens with the

understanding that it would be divided among the heirs, the fact remains that the members of the Nichols family, during the claimed period of incompetency, engaged in important business transactions with decedent. We have already mentioned the conveyance of the forty-acre tract in 1937 to Roy Phillips, son of Mary Phillips. In 1936, 1937, and 1938, respectively, plaintiff, Susie Mullens Workman, obtained from decedent a lot in the Town of Mullens, household furnishings at the Mullens home place, subject to a life estate in decedent, and ten shares of the stock of the Peoples Bank of Mullens. In 1936 and 1938, respectively, plaintiff, Hattie Mullens, a granddaughter, obtained from decedent a lot in the Town of Mullens and ten shares of the stock of Peoples Bank of Mullens. In 1938 decedent transferred to plaintiff, Van B. Mullens, ten shares of the bank stock, and, "just a short time" before his father's death, the grist mill and two engines.

Plaintiffs' counsel rely further upon the facts that decedent did not attend meetings of the board of directors of the bank for several years prior to his death; that, according to several witnesses, on occasions he failed to recognize his acquaintances, and on one or two occasions mistook a newspaper office for the post office. The failure to attend board meetings is explained by witnesses of unquestioned integrity to the effect that decedent disliked tobacco smoke which usually filled the room during directors' meetings, and the late hour at which the meetings were held. Decedent's failure to recognize his friends and the post office incident are fully explained by the fact that during his later years he had cataracts on his eyes, and, according to some witnesses, was nearly blind. The record, however, discloses that when he was told that he was in the newspaper office instead of the post office, he crossed the street in the direction of the latter office.

On appeal to this Court the findings of the trial chancellor are, of course, entitled to great weight, and will not be reversed unless clearly wrong or against the preponderance of the evidence. *Board of Com'rs of Ohio County* v. *Elm Grove Mining Co.*, 122 W. Va. 442, 9 S. E. (2d) 813; *Pickens* v. *O'Hara*, 120 W. Va. 751, 200 S. E. 746;

*Atwater & Co.* v. *Fall River Pocahontas Collieries Co.*, 119 W. Va. 549, 195 S. E. 99; *Highland* v. *Davis, Id.* 501, 195 S. E. 604; *Shipper* v. *Downey, Id.* 591, 197 S. E. 355. But where the findings are clearly wrong, or against the plain preponderance of the evidence, they will be set aside on appeal. *Tokas* v. *J. J. Arnold Co.*, 122 W. Va. 613, 11 S. E. (2d) 759; *Buskirk* v. *Bankers Finance Corporation*, 121 W. Va. 361, 3 S. E. (2d) 450; *Blue* v. *Hazel-Atlas Glass Co.*, 106 W. Va. 642, 147 S. E. 22; *Hendrick* v. *Jenkins*, 104 W. Va. 486, 140 S. E. 483.

A careful appraisal of all the evidence bearing on decedent's mental capacity, with due consideration given to the character of the witnesses offered in support of and against the proposition that decedent had sufficient mental capacity to execute the deeds, impels us to say that the trial chancellor's finding on the question of mental capacity is against the clear preponderance of the evidence.

The second ground of attack on the deeds is that they are invalid by reason of undue influence which the Lillys exercised on A. J. Mullens to bring about their execution. Undue influence necessary to vitiate and annul a deed or a will must be such as to amount to moral force and coercion destroying the free agency of the will. *Ebert* v. *Ebert, supra*, 722, 735, 200 S. E. 831; *Doak, Admr.* v. *Smith*, 93 W. Va. 133, 116 S. E. 691; *Woodville* v. *Woodville*, 63 W. Va. 286, 60 S. E. 140; *Stewart* v. *Lyons*, 54 W. Va. 665, 47 S. E. 442; *Coffman* v. *Hedrick, supra.* The force and coercion necessary to invalidate such instrument need not be physical. *Ebert* v. *Ebert, supra*, 735, 200 S. E. 831; *Snodgrass* v. *Weaver*, 120 W. Va. 444, point 3 syl., 199 S. E. 1. Though it requires a less showing of undue influence where advanced age, physical or mental weakness is involved, such circumstances, however, of themselves raise no presumption of undue influence. They simply tend slightly to establish it. *Teter* v. *Teter*, 59 W. Va. 449, 53 S. E. 779; 2 Black on Rescission and Cancellation (2d Ed.) section 247, note 99. Of course, the burden of proving undue influence rests upon the one who assails a deed, will or other instrument. *Bade, Admr.* v. *Feay*, 63 W. Va. 166, 61 S. E. 348.

In the consideration of this question, we assume that A. J. Mullens was mentally competent to execute the deeds. It should, however, be said in fairness to plaintiffs that, at the time the conveyances were made, decedent had already felt to some extent the infirmities of his advanced age. Perhaps he was more susceptible to undue influence than if he had been a person of younger years, and there is evidence in the record showing that during the period of years through which the questioned conveyances were made, the Lillys frequented the Mullens home and H. E. Lilly engaged often in private conversations with decedent. However, the mere opportunity to exercise undue influence is only a circumstance to be considered by the court and is not undue influence itself. *Ebert* v. *Ebert, supra.* This record discloses evidence tending to show the opportunity of exercising undue influence, but there is no evidence of the actual exercise of influence by the Lillys in bringing about the execution of any of the deeds. In fact, plaintiffs' counsel frankly admit in their brief that the facts and circumstances surrounding the obtaining of the deeds did not appear in the evidence; "the record is silent as to why and under what circumstances A. J. Mullens made these conveyances." In support of their position, they say that there was a confidential relationship existing between the defendant, H. E. Lilly, and decedent. That claim is based upon the evidence to the effect that in a number of cases Lilly did transact business for decedent; that he had obtained from decedent a power of attorney, limited, however, to the collection of rents upon certain properties; that the conveyances to the Lillys now under attack were without any or with inadequate consideration. We are unable to apprehend how the relationship between decedent and H. E. Lilly amounts to such as will give rise to a presumption of undue influence. The power of attorney was indeed limited. Under it Lilly could not have obtained for himself and his family title to the properties in question. The fact that decedent held a warm attachment for his daughter, Nora Lilly, and her children did not constitute undue influence or raise any presumption thereof. In no case

is mere love or affection sufficient to vitiate an instrument where the party making it had sufficient capacity to comprehend the nature of the business, and he did so of his own free will. *Greer* v. *Greer,* 9 Gratt. 330, 333, (50 Va. 330, 335); *Stewart* v. *Lyons, supra.* Moreover, the plaintiffs here were equally as close by blood or marriage to decedent as was the Lilly family. In fact, as we have said, they, too, with a few exceptions, have also been the objects and beneficiaries of decedent's generosity and bounty.

Defendants make several assignments of error. They say the trial court erred in the following particulars: (1) directing issues out of chancery; (2) overruling motions for a mistrial and to set aside the verdict on the ground that one of plaintiffs' counsel transported in his automobile one W. E. Bailey, a juror, while said juror was engaged in the instant trial, between Pineville and his home in Corrine, some distance beyond Mullens, and in company with two of plaintiffs' witnesses, one of whom had testified; (3) directing that the issues be tried by the jury at one time as to all of the deeds in question; (4) admitting over objection certain specified testimony; (5) ruling adversely on certain parts of the closing argument of one of plaintiffs' counsel; (6) ruling regarding the verdict and its amendments; and (7) overruling defendants' motion to set aside the verdict.

The verdict of a jury rendered on an issue out of chancery is simply advisory to the trial chancellor. Its only object is to enlighten the conscience of the court. *Ammons* v. *South Penn Oil Co.,* 47 W. Va. 610, 626, 35 S. E. 1004. Under Code, 56-6-4, errors committed on the trial of an issue out of chancery do not warrant a new trial. Inasmuch as we think that the verdict of the jury was not supported by the evidence and the trial court was not justified in entering the decree complained of, any ruling which we would make upon the assignments of error could not in any way affect our decision. However, in the interest of the integrity of jury trials in this State, we cannot allow to go unnoticed, the transportation of the juror between Pineville and his home by one of plaintiffs' attorneys. Though the record does not disclose that

the attorney had any improper motives, conduct such as this cannot be condoned in our practice without tending to undermine our jury system. No matter what may be the motives of the parties or their counsel in any case, this Court feels that it is in duty bound to the full extent of its powers to do everything which may be required to maintain the integrity of jury trials. If such a position is not taken, through the course of years, lawyers, parties litigant, and the public may lose confidence in trial by jury, which is part and parcel of our Anglo-Saxon system of justice. The trial court indicated by reference in its decree to the two issues out of chancery that it relied upon the verdict of the jury in appraising the evidence in this case. The conduct complained of may have worked to defendants' prejudice. It may be that were it not for the attorney's conduct, the verdict might have been different and the trial chancellor might have entered a different decree. Though it does not and cannot, under the instant circumstances, constitute reversible error, we are prompted, in the interest of justice, to give it attention in this opinion.

The trial court erred in entering the decree complained of. It is accordingly ordered that this cause be remanded with directions that plaintiffs' original and amended bills complained of be dismissed, without prejudice, however, to the estate of A. J. Mullens to assert in a proper forum any and all claims which it may have against any of the parties herein, including the claim against H. E. Lilly for the sum of $2,088.46, as shown by the final decree.

*Reversed and remanded.*